AARON SPOLIN (State Bar No. 310379)
ClientMail@SpolinLaw.com
SPOLIN LAW P.C.
11500 W. Olympic Blvd., Suite 400
Los Angeles, CA 90064
(310) 424-5816
(310) 312-4551

Attorney for Petitioner

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CARLOS RAZO CERVANTES,<br><br>       Petitioner,<br><br>   vs.<br><br>CHRISTIAN PFEIFFER, as Acting Warden, Kern Valley State Prison,<br><br>       Respondent. | Case No.:<br><br>**Petitioner Carlos Razo Cervantes' Verified Petition for Writ of Habeas Corpus by a Person in State Custody Under 28 U.S.C. § 2254.** |

Petitioner, Carlos Razo Cervantes (hereinafter "Petitioner"), through undersigned counsel, files this Verified Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, and in support thereof, avers as follows:

## A. Procedural History

1. Petitioner is Carlos Razo Cervantes.

2.    Petitioner is unlawfully confined in the Kern Valley State Prison pursuant to a judgment of the Superior Court of California for Kern County in *People v. Cervantes,* case number BF165489A.

3.    Petitioner is currently unlawfully confined in the Kern Valley State Prison, 3000 West Cecil Avenue, Delano, CA 93216.

4.    Christian Pfeiffer is the acting warden of the Kern Valley State Prison.

5.    On March 7, 2017, the People filed an information charging Petitioner with two counts of murder. (P.C. § 187(a).)

6.    As to both counts, the People alleged the multiple murder (P.C. § 190.2(a)(3)), personal and intentional firearm discharge causing great bodily injury (P.C. § 12022.53(d)), and personal firearm discharge during the commission of murder (*Id*. at § (c)) enhancements.

7.    Petitioner's jury trial commenced on June 28, 2018.

8.    On July 10, 2018, the jury found Petitioner guilty as charged and found true the enhancements.

9.    On August 9, 2018, the trial court sentenced Petitioner to two consecutive terms of life imprisonment without the possibility of parole followed by a consecutive, indeterminate term of 50 years to life imprisonment.

10.    That same day, Petitioner filed a timely notice of appeal.

11.     On October 14, 2020, the California Court of Appeal for the Fifth District affirmed Petitioner's judgment. *People v. Cervantes* (2020) 55 Cal.App.5th 927.

12.     On November 17, 2020, Petitioner filed a petition for review with the California Supreme Court which was denied on January 13, 2021.

## B.     Factual History

13.     The following facts are largely replicated from Petitioner's opening brief on direct appeal:[1]

## A. Prosecution

Jeffrey Villegas (Jeff) lived at 137 West 15th Street in Delano. (2RT 76.) Jose Fernandez and his girlfriend, Anna Zavala, were roommates of Jeff's and shared his house but did not have a key or the code to the lock on the house. (3 RT 221, 227-228, 234, 246.) Petitioner lived next door to Jeff on the west side of Jeff's house. (3RT 143-144, 173, 287.) Lou lived next door to Jeff on the east side of Jeff.[2] (3RT 143, 173, 287.)

---

[1] Many of the witnesses and the victims have first or nicknames by which they are most frequently referred to in the trial. For ease of reference, they are: Jeffrey Villegas—Jeff; Jose Ceja—Chema (3RT 159, 225); Lounita Villaruz—Lou or Luo; Jose Fernandez—Beaner (3 RT 221, 233); Roland Claro—Roland; Jesus Herrera—apparently Chuy (3RT 276); and Roberto Chavez—Bobby (3RT 300.) Because the surnames of Jeffrey Villegas and Lounita Villaruz are somewhat similar, Petitioner will refer to them as Jeff and Lou, the way they are most often referred to in the record to avoid confusion. No disrespect is intended.

[2] Lou testified under a grant of use immunity from the prosecutor. (3RT 139-140, 169, 215.)

In the late afternoon/early evening hours on September 4, 2016, Petitioner, Lou, Roland Claro, Roberto Chavez, and a neighbor named Jesus Herrera were having a conversation in front of Petitioner's house on West 15th Street in Delano. (3RT 144-145, 169, 276, 299-300.) Petitioner was on his side of the fence and the others were outside the fence on the street side on the sidewalk. (3RT 170, 277, 285, 299.) Petitioner wanted to know how he could get a hold of Jeff. He wanted a phone number where he could reach him at Chavez's brother's house. (3RT 278-279.) He wanted Chavez to call him. (3RT 279.) Petitioner said something about whether Chavez would go to Jeff's house with him and make some "quick money as a gesture," a possible reference to taking things from Jeff. (3RT 279-280.) Chavez declined. (3RT 279-280.) Petitioner did not mention any money Jeff owed him, although Jeff owed Petitioner some $2,100 for work Petitioner had done for him. Despite several requests by Petitioner to Jeff, Jeff still had not paid him. (3RT 280, 1CT 196, 197, 198-199, 213, 214.)

The conversation between the men in front of Petitioner's house lasted some 30 minutes to an hour. (3RT 170, 289.) Petitioner had been drinking "about two days straight" and appeared to be drunk or tipsy. (3RT 146, 178, 210, 278, 286, 310.) During the conversation Claro left and went two houses over to the front yard of Lou's house to use Lou's WIFI connection. (3RT 150, 151-152, 170, 171, 286, 299,

311-312.) Sometime before the conversation ended, Jose Ceja went into Jeff's yard looking for Jeff and waited in the front of Jeff's house. (3RT 159, 160, 179, 288.)

Jeff pulled up to his house next door in his Chevy van just before the people disbursed in front of Petitioner's house, exited his vehicle, and walked onto his property in the direction of the front door. (3RT 146, 179, 289.) While still in front of Jeff's as the men left, Chavez, while heading to Lou's, looked back and saw Petitioner enter Jeff's property with a squarish, black object in his hand that may have been a gun that he removed from his waistband. (3RT 281, 290, 291, 293, 296.) Chavez heard a clicking sound of a gun being "racked" as Petitioner went into the property in the direction of the front door. (3RT 281-283, 287.) Chavez may have told police he heard Petitioner say, "Hey, bitch, you want to talk shit about me?" (3RT 283.)

As the men continued on their way, Lou was walking into the yard of his own house. (3RT 146.) Chavez was walking ahead of Lou several feet and about to sit down where Claro was sitting at a patio table in Lou's front yard. (3RT 174, 282, 286-287, 302.) Apparently while still on the sidewalk in front of Petitioner's, Lou heard Petitioner say, with respect to Jeff, "I'm gonna get him." (3RT 145- 146, 205, 210, 211.) Petitioner had become agitated because Jeff had pulled up. (3RT 146.) While in Lou's driveway or yard after leaving the front of Petitioner's house, Lou and Chavez heard Jeff yell, "I didn't say anything. I didn't say anything" or "I didn't

say anything, Carlos." (3RT 147, 180, 276, 283.) Petitioner had told Chavez sometime before that he wanted to get Jeff because Jeff owed him money. (3RT 284.)

Lou, Chavez, and Claro heard several gunshots about that time. (3RT 147-148, 206, 276-277, 283, 302.) According to Chavez and Claro, the first gunshots happened before Jeff said, "I didn't say anything." (3RT 292, 313, 314.) They each had heard two shots, then Jeff scream that he did not say anything or "No. No, I wasn't talking shit." Then, according to Claro, he heard two more shots, and then according to both Claro and Chavez, another four shots in a row. (3RT 303, 318.)

Lou was about three steps into his driveway when he heard the shots. (3RT 174, 205.) Jesus was walking close to Lou but on the sidewalk at the time heading toward his house further east. (3RT 175-176, 315.) Chavez was in Lou's front yard approaching Claro. (3RT 291-292.) Claro was sitting down in Lou's front yard at a patio table near the front door when the shots were heard. (3RT 174-175, 301.) Soon after hearing the shots, Chavez and Claro saw Petitioner leaving Jeff's property in the direction of his own house. (3RT 284, 304, 318, 4RT 341.)

After the gunshots, Lou stayed in the front of the house for a time. (3RT 181.) Chavez left immediately after the shots. (3RT 292, 313, 315-316.) According to Claro, Lou put back a dog that had gotten loose from Petitioner's yard. (3RT 305, 316-317, 318.) Lou then got into his pickup truck that was parked in front of

Petitioner's or Jeff's on the sidewalk and drove around the block, taking the long way, and came back to his house a couple of minutes later. (3RT 181, 183- 186, 208-209, 305-306, 318.) Claro stayed in the yard. (3RT 181, 183.) When Lou returned, Claro was still there but Chavez had gone. (3RT 186-187.)

Lou then went into his house with Claro and checked on his mother. (3RT 187-188, 306.) After some time, Lou went outside to see what was going on. (3RT 187-188.) Claro was in the restroom using his computer. (3RT 188, 306-307, 319.) Neither Lou nor Claro called 9-1-1. (3ET 188, 320, 4RT 339.) Both Lou and Claro heard Fernandez and/or Anna Zavala calling "Lou, Carlos" for help. (3RT 188-189, 307-308.) Claro went outside and left shortly thereafter. (3RT 308.)

Fernandez and Zavala returned to Jeff's in their vehicle when it was getting dark after being out most of the day. (3RT 222, 234.) After pulling into Jeff's driveway, they stayed in the vehicle a few minutes. (3RT 222.) Zavala exited the vehicle and saw Jose Ceja underneath the diesel truck on the ground. (3RT 223, 229, 236) She thought he was asleep. (3RT 223.) She called out to him, but he did not answer. (3RT 223.) She told Fernandez. (3RT 223, 235.) Fernandez exited his vehicle to check. (3RT 223-224246-247.) Fernandez called Ceja's name, but he did not respond. (2RT 236.)

Fernandez pulled Ceja from underneath the diesel tractor-trailer/semi, gave him CPR and tried to resuscitate him because he was not breathing. (2RT 87, 3RT

158, 159, 165, 166, 224-225, 235-237.) Zavala remained in the car. (3RT 210.) Fernandez' efforts to revive Ceja were unsuccessful. (3RT 225, 236.) Fernandez also saw Jeff's body on the front porch, but he did not perform CPR on him because he "knew he was gone" already. (3RT 238.)

Zavala called 911 after seeing Jeff by the front door on the ground. (3RT 226.) Fernandez and Zavala then called out to the neighbors, Lou and Petitioner. (3RT 225, 239, 217-218.) Lou came over to the fence between his property and Jeff's or went on Jeff's property. (3RT 158, 225, 239, 189-190, 217-218.) Lou observed Fernandez giving mouth to mouth to Ceja and pouring water on him. (3RT 190.) Neither Zavala nor Fernandez recalled any other neighbors besides Lou showing up. (3RT 227, 245.)

According to Lou, while Fernandez was trying to resuscitate Ceja, Petitioner walked up beside him and began picking up spent shells. (3RT 191, 211, 212.) Petitioner left shortly thereafter. (3RT 212.) Lou told a detective he had not seen Petitioner after the bodies were found. (4RT 379.)

After Fernandez finished trying to resuscitate Ceja, he gave Lou a chrome, gray, or silver handgun with a magazine in it to hold for him that he retrieved from his car. Someone had been killed there and Fernandez did not want the gun in his car if it was searched. (3RT 162, 195-196, 228, 229, 231, 239-241, 248, 4RT 369.)

Lou put the gun in a plastic tub/container in his front yard or porch. (2RT 163, 197, 201.)

Jeff owed Lou $4,000 for bailing him out of jail and Jeff was not making the payments. (3RT 199.) Lou was upset about it, and the bail bondsman was harassing Lou when Jeff did not pay. (3RT 199, 214.) Two days before the shootings, Lou yelled at Jeff about the money. (3RT 200-201.) Lou told a detective he had $4,000 on his mind. (3RT 200.) When Lou bailed Jeff out, he knew there was a risk Jeff would not be able to pay. (3RT 200, 214.)

Lou had video surveillance cameras at his house that day showing different areas. (3RT 148-150, 155.) At certain points Claro, Lou, Fernandez, Zavala, and Petitioner are shown in the video on or near Lou's property or next door at Jeff's. (3RT 150, 156, 157, 164-165, 167.) Petitioner is shown coming into Lou's yard that evening. (3RT 156, 157, 158, 161.)

The surveillance video of Lou's house shows what appears to be a black or dark gun in Lou's hand as he returned to his house, not a chrome or silver gun as Fernandez described. (3RT 161-162, 241- 242, 4RT 368, 387-388.) Lou denied going to Jeff's house with a gun. (3RT 162.) He also denied shooting Jeff or Ceja. (3RT 163.)

Fernandez had seen Petitioner fire a gun in Petitioner's yard during a barbecue. (3RT 246.) Fernandez told police it was Lou's gun. (3RT 246.) Fernandez

also told police that he saw Petitioner go up to a vehicle that Jeff was in a few days before Jeff's death, pull out a gun and say, "Tell me why I shouldn't shoot you right now." Jeff responded he would get Petitioner his money. (3RT 250-251, 4RT 345.)

When police arrived, Ceja had a weak pulse but was rapidly failing. (2RT 98.) Jeff was lying in the front porch area of his house by the front door some 30 feet from where Ceja was lying after Fernandez moved him from underneath the truck. (2RT 81-83, 97- 98.) Five spent .9-millimeter shell casings and three live rounds were found near the bodies. (2RT 76, 105, 4RT 350-352.) One was under Jeff. (2RT 123.) The shell casings were from a .9-millimeter Glock handgun, the type of gun used on Jeff and Ceja. (4RT 350, 368, 385.) Beer cans were also in the area. (2RT 105.)

Lou admitted he owned a Glock 9-millimeter gun but told police it had been stolen from his car and he never reported the theft. (3RT 202.) He later told police he had given it to Petitioner. (4RT 392-393.)

Jeff died from multiple gunshot wounds, two of which damaged the heart and aorta causing massive hemorrhaging. (3RT 258-260.) Ceja also died from multiple gunshot wounds, one of which pierced the vena cava, the largest vein in the body. Another bullet caused massive damage to Ceja's heart. (3RT 263, 264, 270.)

**Petitioner's statements**

When first interviewed by Detective Scott at his home on September 7, 2016, Petitioner said he was in Bakersfield the evening of September 4th but was not allowed to go to his home when he returned because the area had been cordoned off by police. (4RT 355.) When asked if he had been to Lou's house that evening, he denied it. (4RT 356.) When asked about his relationship with Jeff, he said he had done some repair work for Jeff, a partial payment had been made, but Jeff had not finished paying him off. (4RT 356-357.) Petitioner said he was struggling, eating spoiled food or food from the garbage can while Jeff was living rent free. (4RT 357.)

Petitioner was later arrested and taken to the Delano Police Department where an interrogation by Detective Scott was videotaped on September 7, 2016. (4RT 357, 1CT 179-219.) During the interrogation, he denied he was present at Jeff's house the evening of the murder. (1CT 187.) He discussed his whereabouts and activities during the day and evening. (1CT 179—192, 206, 208-211.) He admitted going over to Lou's at some point, indicating he knocked on the door before he left to go to Bakersfield, but Lou did not answer, and Petitioner was uncertain as to the exact time because he had been drinking. (1CT 187-188, 191-192, 210-211.) He insisted he knocked on Lou's door, even though Scott informed him that the video did not show him knocking of the door. (1CT 192.) He denied seeing Chavez that Sunday but acknowledged seeing Jesus and Claro. (1CT 189-190.)

He was not home that night, so he did not hear any gunshots. (1CT 192-193.) He later acknowledged hearing four or five gunshots from inside his house and then going to Bakersfield. (1CT 194-195, 208.)

Jeff did not pay Petitioner the full amount of money he owed him for building a wall for him when Petitioner was struggling. Jeff said he would pay him. (1CT 196-197.) Jeff owed him $2,500 but had only paid him $400. (1CT 198.) When Petitioner would ask him for his money, Jeff would say he would see what he could do, would pay him some money, but never tried to give him the whole amount. (1RT 199, 213-215.) Consequently, Petitioner was not interested in helping Jeff after he heard the shots. (1CT 195-197.) Jeff was living there rent free without any worries and did not care about paying Petitioner. (1CT 199.) He had not talked about the money with Jeff that Sunday or for many months. (1CT 199.)

He denied shooting Jeff. (1CT 202, 216, 218.) He denied having a gun for protection and that someone had given him a gun to hold for his protection but stated he had one before. (1CT 201.) He denied talking to Jeff or that Jeff came to his house that day. (1CT 203, 204.)

Petitioner cared a great deal about the welfare of his grandfather for whom he was a caretaker. (1CT 184-185, 197, 199, 212-213.)

Following the interrogation, Detective Scott took Petitioner to the area where he was to be processed/booked to collect biographical information. (4RT 361.)

During the process Petitioner asked if he could speak with his grandfather. (4RT 363.) Scott told him no. (4CT 363.) Petitioner then said, "I'll tell you what happened Sunday if you let me talk to my grandfather." (4RT 363.) Scott told him, "Tell me what you're gonna tell me. Tell me what happened on Sunday." (4RT 363.)

Another officer who was present then video recorded the subsequent conversation with a cellphone. (4RT 363.) Petitioner told Scott he shot both subjects. He did so out of rage from having seen Jeff living better than him. He denied doing it because he was struggling and because Jeff did not pay him, stating he did it "just for the fuck of it." "[H]e was always buying shit, you know what I mean, uhm, eat out every day….how would you feel? Eating all fucking rotten food, you know what I mean?" Petitioner stated he had the gun at his house before he shot him and had later melted it down at a chop shop in Delano or Bakersfield. When asked why he shot the other person, Ceja, Petitioner replied, "Fucking witness." (1CT 220-222.)

### B. Defense

Officer Mendoza was dispatched to the crime scene at 8:40 p.m. and spoke with Lou, apparently at his house. (4RT 395-396.) Lou stated he had left his residence about 8:00 p.m. and denied walking onto Jeff's property. (4RT 396.) He said he did not hear any gunshots. (4RT 397.) He said when he returned home the only person in his house was his mother. (4RT 397.) He told the officer the camera

affixed to the front of his house worked but did not record. (4RT 397.) He said nothing about not knowing how to use the camera. (4RT 397.)

### C. Claims for Relief

### I. Claim One

14. Paragraphs 1 through 13 are hereby incorporated by reference.

15. Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments due to the retroactive application of P.C. § 859.5.

16. Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

17. The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim One is hereby incorporated by reference.

### II. Claim Two

18. Paragraphs 1 through 17 are hereby incorporated by reference.

19. Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments due to the trial court's erroneous admission of Petitioner's involuntary confession.

20. Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

21. The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Two is hereby incorporated by reference.

**III. Claim Three**

22. Paragraphs 1 through 21 are hereby incorporated by reference.

23. Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments due to the trial court's erroneous voluntary intoxication jury instruction.

24. Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

25. The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Three is hereby incorporated by reference.

**IV. Claim Four**

26. Paragraphs 1 through 25 are hereby incorporated by reference.

27. Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the trial court erroneously instructed the jury on flight.

28. Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

29. The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Four is hereby incorporated by reference.

**V.  Claim Five**

30. Paragraphs 1 through 29 are hereby incorporated by reference.

31. Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments due to ineffectiveness of trial counsel.

32. Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

33. The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Five is hereby incorporated by reference.

## VI.  Claim Six

34.  Paragraphs 1 through 33 are hereby incorporated by reference.

35.  Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where he is legally, factually, and actually innocent of the offenses of which he was charged, convicted, and sentenced.

36.  Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

37.  The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Six is hereby incorporated by reference.

## D.  Prayer for Relief

WHEREFORE, Petitioner respectfully requests that this Honorable Court:

1.  Take judicial notice of the transcripts, records, and files in Carlos Razo Cervantes: Kern County, case number BF165489A; California Court of Appeal, Fifth District, case number F077943; California Supreme Court case number S265607.

2.    Order Respondent and the People of California to file and serve a certified copy of the record on appeal and show cause why Petitioner is not entitled to the relief sought;

3.    Grant a hearing to enable Petitioner to satisfy his remaining burden of proof, namely that the error had a substantial and injurious effect or influence in determining the jury's verdict;

4.    Find that the state court unreasonably determined the facts and unreasonably applied clearly established Federal law;

5.    Grant this Petition for Writ of Habeas Corpus; and

6.    Grant Petitioner any additional, appropriate relief as ordered by this Honorable Court.

Dated: February 3, 2022                    Respectfully submitted,


                                           SPOLIN LAW P.C.


                                    By:    /s/ Aaron Spolin
                                           Attorney for the Petitioner

## **VERIFICATION**

I, Aaron Spolin, hereby declare as follows:

I am an attorney admitted to practice law in the State of California. I represent Petitioner herein, who is confined and restrained of his liberty at the Kern Valley State Prison, in Kern County. I have read the foregoing Petition for Writ of Habeas Corpus and am informed and believe the allegations therein are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 3, 2022, at Los Angeles, California.


/s/ Aaron Spolin
Aaron Spolin

AARON SPOLIN (State Bar No. 310379)
ClientMail@SpolinLaw.com
SPOLIN LAW P.C.
11500 W. Olympic Blvd., Suite 400
Los Angeles, CA 90064
(310) 424-5816
(310) 312-5551

Attorney for Petitioner

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF CALIFORNIA

CARLOS RAZO CERVANTES,

      Petitioner,

  vs.

CHRISTIAN PFEIFFER, as Acting
Warden, Kern Valley State Prison,

      Respondent.

Case No.:

**Memorandum of Points and Authorities.**

    Petitioner, through counsel Aaron Spolin, hereby submits the following Memorandum of Points and Authorities in support of his Petition, filed pursuant to 28 U.S.C. § 2254.

# TABLE OF CONTENTS

Table of Authorities..................................................................... 4

1.   Statement of the Case.................................................... 10

2.   Law and Argument ....................................................... 10

A.   Habeas Standards ...................................................... 10

B.   Timeliness................................................................ 12

C.   Exhaustion................................................................ 14

D.   Substantive Claims.................................................... 15

I.     Claim One—Petitioner Was Denied His Federal Constitutional Right to
Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to the
Retroactive Application of P.C. § 859.5......................................... 15

II.    Claim Two—Petitioner Was Denied His Federal Constitutional Right to
Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to the
Trial Court's Erroneous Admission of Petitioner's Involuntary Confession.  27

III.   Claim Three—Petitioner Was Denied His Federal Constitutional Right
to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to
the Trial Court's Voluntary Intoxication Jury Instruction. ............................ 29

IV.     Claim Four—Petitioner Was Denied His Federal Constitutional Right

to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where

the Trial Court Erroneously Instructed the Jury on Flight.............................. 32

V.     Claim Five—Petitioner Was Denied His Federal Constitutional Right to

Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to Trial

Counsel's Ineffectiveness. ................................................................. 33

a. Trial Counsel Failed to Adequately Investigate and Evidence that Lou was

the Actual Shooter and That Petitioner's Alleged Confession was Coerced.

..................................................................................................... 36

b. Trial Counsel Failed to Consult, Retain, or Call at Trial Necessary Expert

Witnesses.................................................................................... 39

c. Trial Counsel Failed to Investigate the Propriety of the Investigation

Against Petitioner or to file a *Pitchess* motion............................................. 43

VI.     Claim Six—Petitioner Was Denied His Federal Constitutional Right to

Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to His

Claim for Actual Innocence........................................................................ 45

Conclusion................................................................................................ 48

Certificate of Service ............................................................................... 49

*American Steel Foundries v. Tri–City Central Trades Council,* 257 U.S. 184

  (1921) ................................................................................................ 22

*Andrus v. Charlestone Stone Products Co.,* 436 U.S. 604 (1978) ........................ 23

*Arizona v. Roberson,* 486 U.S. 675 (1988) ............................................................ 20

*Baldwin v. Reese,* 541 U.S. 27 (2004) .................................................................... 14

*Baylor v. Estelle,* 94 F.3d 1321 (9th Cir. 1996) .................................................... 40

*Bell v. Cone,* 535 U.S. 685 (2002) ......................................................................... 11

*Bowen v. Roe* (1999) 188 F.3d 115 ........................................................................ 14

*Boyde v. California,* 494 U.S. 370 (1990) .............................................................. 30

*Bradley v. School Bd. of Richmond,* 416 U.S. 696 (1974) ......................... 21, 24, 25

*Brown v. Mississippi,* 297 U.S. 278 (1936) ........................................................... 18

*Bruner v. United States,* 343 U.S. 112 (1952) ....................................................... 22

*Cam v. Calderon* 165 F.3d 1223 (9th Cir. 1999) ................................................... 40

*Carriger v. Stewart,* 132 F.3d 463 (9th Cir. 1997) ................................................ 47

*Chapman v. California,* 386 U.S. 18 (1967) .......................................................... 31

*Clewis v. Texas,* 386 U.S. 707 (1967) .................................................................... 20

*Collazo v. Estelle,* 940 F.2d 411 (1990) ................................................................ 19

*Collazo v. Estelle,* 940 F.2d 411 (9th Cir. 1991) .................................................. 17

---

*Colorado v. Spring,* 479 U.S. 564 (1987)................................................................. 17

*Culombe v. Connecticut,* 367 U.S. 568 (1961)......................................................... 18

*Derrick v. Peterson,* 924 F.2d 813 (9th Cir.1990).................................................. 16

*Edwards v. Carpenter,* 529 U.S. 446 (2000)................................................. 14, 19, 20

*Evanchyk v. Stewart,* 340 F.3d 933 (9th Cir. 2003) .............................................. 30

*Ex parte Collett,* 337 U.S. 55 (1949)....................................................................... 23

*Greene v. Fisher,* 565 U.S. 34 (2011) ...................................................................... 11

*Hall v. Beals,* 396 U.S. 45 (1969)............................................................................ 22

*Hallowell v. Commons,* 239 U.S. 506 (1916)........................................................... 23

*Harrington v. Richter,* 562 U.S. 86 (2011)............................................................... 10

*Herrera v. Collins,* 506 U.S. 390 (1993)........................................................... 46, 47

*Ho v. Carey,* 332 F.3d 587 (9th Cir. 2003).............................................................. 30

*In re Cordero,* 46 Cal.3d 161 (1988)........................................................................ 40

*In re Marquez,* 1 Cal.4th 584 (1992) ....................................................................... 35

*In re Saunders* (1970) 2 Cal.3d 1033 ....................................................................... 36

*In re Sixto* (1989) 48 Cal.3d 1247 ........................................................................... 40

*Jackson v. Virginia,* 443 U.S. 307 (1979) ............................................................... 46

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ............................................ 22

*Lockhart v. Fretwell*, 506 U.S. 364 (1993)............................................................... 35

*Lynumn v. Illinois,* 372 U.S. 528 (1963) ................................................................. 21

*MacFarlane v. Walter,* 179 F.3d 1131 (9th Cir. 1999) .......................................... 12

*McBurney v. Carson*, 99 U.S. 567 (1879) .............................................................. 24

*Michigan v. Tucker,* 417 U.S. 433 (1974) .............................................................. 20

*Middleton v. McNeil,* 541 U.S. 433 (2004) ............................................................ 30

*Miller v. Fenton,* 474 U.S. 104 (1985) .................................................................. 16

*Mincey v. Arizona,* 437 U.S. 385 (1978) ......................................................... 16, 18

*Miranda v. Arizona,* 384 U.S. 436 (1966) ..................................... 19, 20, 28, 38

*Moses v. Payne,* 555 F.3d 742 (2009) ................................................................... 12

*Neder v. United States*, 527 U.S. 1 (1999) ........................................................... 31

*O'Sullivan v. Boerckel,* 526 U.S. 838 (1999) ....................................................... 14

*Oregon v. Bradshaw,* 462 U.S. 1039 (1983) ........................................................ 20

*People v. Davis,* 168 Cal.App.4th 617 (2008) ...................................................... 26

*People v. Day* (1992) 2 Cal.App.4th 405 ............................................................. 40

*People v. Frierson* (1979) 25 Cal.3d 142 ............................................................. 40

*People v. Ledesma,* 43 Cal.3d 171 (1987) ...................................................... 34, 40

*People v. Manzo,* 53 Cal.4th 880 (2012) .............................................................. 27

*People v. Patterson,* 2 Cal.5th 885 (2017) ........................................................... 35

*People v. Roldan,* 35 Cal.4th 646 (2005) ............................................................. 31

*Pitchess v. Superior Court,* 11 Cal.3d 531 (1974) ...................................... 35, 43, 44

*Republic Nat. Bank of Miami v. United States,* 506 U.S. 80 (1992) ..................... 23

*Rhode Island v. Innis,* 446 U.S. 291 (1980) ........................................................ 19

*Riley v. Payne*, 352 F. 3d 1313 (9th Cir. 2003) ................................................. 36

*Roman v. Estelle,* 917 F.2d 1505 (9th Cir. 1990) .............................................. 14

*Schell v. Witek,* 218 F.3d 1017 (9th Cir. 2000) ................................................ 40

*Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998) ................................................ 40

*Spano v. New York,* 360 U.S. 315 (1959) .................................................. 18, 21

*Stephens v. Cherokee Nation,* 174 U.S. 445 (1899) ......................................... 23

*Strickland v. Washington*, 466 U.S. 668 (1984) ...................................... passim

*Thorpe v. Housing Authority of Durham,* 393 U.S. 268 (1969) ......................... 24

*United States v. Alabama,* 362 U.S. 602 (1960) ............................................... 23

*United States v. Anderson,* 929 F.2d 96 (2d Cir.1991) ..................................... 19

*United States v. Gomez,* 927 F.2d 1530 (11th Cir.1991) .................................. 19

*United States v. Schooner Peggy,* 2 L.Ed. 49 (1801) ................................... 21, 22

*United States v. Wolf,* 813 F.2d 970 (9th Cir.1987) ......................................... 16

*Vasquez v. Hillary,* 474 U.S. 245 (1986) ......................................................... 14

*Williams v. Taylor,* 529 U.S. 362 (2000) ......................................................... 11

*Yarborough v. Alvarado,* 541 U.S. 652 (2004) ................................................. 11

*Yarborough v. Gentry*, 540 U.S. 1 (2003) ......................................................... 34

*Youakim v. Miller,* 425 U.S. 231 (1976) ........................................................... 24

**Statutes**

28 U.S.C. § 1404(a) ............................................................... 23

28 U.S.C. § 2244(d)(1) ........................................................... 13

28 U.S.C. § 2244(d)(2) ........................................................... 13

28 U.S.C. § 2254 ................................................................. 10

28 U.S.C. § 2254(d) ........................................................... 10, 12

28 U.S.C. § 2254(d)(1) ........................................................ 10, 12

28 U.S.C. 2244 (d)(1)(A) ......................................................... 14

28 U.S.C. 2254(b)(1)(A) .......................................................... 14

P.C. § 29.4(b) ................................................................... 31

P.C. § 859.5 ............................................................... passim

P.C. § 859.5(a) .................................................................. 26

S.B. 1389 ....................................................................... 42

**Other Authorities**

2016 Cal. Legis. Serv. Ch. 791 .................................................. 42

Saul M. Kassin & Katherine L. Kiechel, *The Social Psychology of False*

*Confessions: Compliance, Internalization and Confabulation*, 7 Psychol. Sci. 125

(1996) .......................................................................... 42

**Rules**

U.S.Sup.Ct. Rule 13.1 ........................................................... 14

## Constitutional Provisions

U.S. Const., 14th Amend. ................................................................................ passim

U.S. Const., 5th Amend. ................................................................................. passim

U.S. Const., 6th Amend. ................................................................................. passim

**1.    Statement of the Case**

Petitioner hereby incorporates paragraphs 1-37 of his Verified Petition for Writ of Habeas Corpus by a Person in State Custody, above, which includes the statement of facts.

**2.    Law and Argument**

**A.    Habeas Standards**

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Harrington v. Richter,* 562 U.S. 86, 97 (2011). The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under 28 U.S.C. § 2254(d)(1), a state court's decision is "contrary to . . . clearly established Federal law," as determined by the United States Supreme Court,

"if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone,* 535 U.S. 685, 694 (2002). A state court's decision "involve[s] an unreasonable application of[ ] clearly established Federal law" as determined by the U.S. Supreme Court, within the meaning of § 2254(d)(1), "if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor,* 529 U.S. 362, 407 (2000). The Supreme Court has underscored that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). Accordingly, this Honorable Court may not grant habeas relief if "fairminded jurists could disagree over whether" the state court's decision was correct. *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004).

The governing law is the law that existed at the time the state court rendered its decision. *Greene v. Fisher*, 565 U.S. 34, 40 (2011). With regard to Ninth Circuit Court of Appeals opinions, such may be persuasive authority for purposes of determining whether a particular state court decision is an "unreasonable application" of Supreme Court law, and also may help to determine what law is

"clearly established." *See MacFarlane v. Walter,* 179 F.3d 1131, 1139 (9th Cir. 1999) (looking to Ninth Circuit caselaw to confirm that Supreme Court case clearly establishes a legal rule); citing *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir. 1998) (holding that "to the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness *vel non* of the state court's treatment of the contested issue").

As to whether the state court unreasonably determined the facts in light of the evidence presented, the statement of facts from the last reasoned state court decision "is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence." *Moses v. Payne,* 555 F.3d 742, 746 n. 1, 751 (2009), citing 28 U.S.C. § 2254(d)(1)-(2) & (e)(1).

## B.     Timeliness

Pursuant to 28 U.S.C. § 2254(d), a "1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2254(d)(1). The limitation period shall run from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1)-(2).

Petitioner respectfully submits that his instant petition is timely. On August 9, 2018, the trial court sentenced Petitioner to two consecutive terms of life imprisonment without the possibility of parole followed by a consecutive, indeterminate term of 50 years to life imprisonment. That same day, Petitioner filed a timely notice of appeal. On October 14, 2020, the California Court of Appeal for the Fifth District affirmed Petitioner's judgment. *People v. Cervantes* (2020) 55 Cal.App.5th 927. On November 17, 2020, Petitioner filed a petition for review with the California Supreme Court which was denied on January 13, 2021.

Petitioner did not file a petition for writ of certiorari in the United States Supreme Court following the January 13, 2021, denial of his petition for review in the California Supreme Court during his direct appeal proceedings. Thus, his judgment of sentence became final on April 13, 2021. *Bowen v. Roe* (1999) 188 F.3d

1157, 1158-59; U.S.Sup.Ct. Rule 13.1. Petitioner's instant Petition is being filed

before April 13, 2022, within the one-year deadline allotted pursuant to 28 U.S.C.

2244 (d)(1)(A).

## C. Exhaustion

Pursuant to 28 U.S.C. 2254(b)(1)(A), "[a]n application for a writ of habeas

corpus on behalf of a person in custody pursuant to the judgment of a State court

shall not be granted unless it appears that . . . the applicant has exhausted the

remedies available in the courts of the State[.]" Claims must be raised in accordance

with state procedural rules. *Edwards v. Carpenter,* 529 U.S. 446, 453 (2000).

Fundamental to federal habeas is the principle that the highest state court should be

given a fair opportunity to first rule on the petitioner's claims. *O'Sullivan v.

Boerckel,* 526 U.S. 838, 847 (1999) (exhaustion requires presentation to highest state

court where presentation is part of the state's ordinary appellate procedure).

Appellate issues are only exhausted to the extent that the particular issue is included

in a petition for review to the California Supreme Court. *Roman v. Estelle,* 917 F.2d

1505, 1506 (9th Cir. 1990). The federal claim must be "fairly presented" to the state

courts. *Baldwin v. Reese,* 541 U.S. 27 (2004). Additional evidence may be admitted

that does not "fundamentally alter" the claim originally presented to the state courts.

*Vasquez v. Hillary,* 474 U.S. 245, 260 (1986).

Petitioner raised claims one through four in his direct appeal to the California Court of Appeal and in his petition for review filed in the California Supreme Court, which addressed the claims on the merits. Thus, these claims are exhausted and subject to the AEDPA. Along with this Petition, Petitioner files a concomitant Motion for a *Kelly* stay while he exhausts state court remedies with respect to claims five and six.

### D. Substantive Claims

### I. Claim One—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to the Retroactive Application of P.C. § 859.5.

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

*Miller v. Fenton,* 474 U.S. 104, 112 (1985), calls on this Court to determine

"whether, under the totality of the circumstances, the challenged confession was

obtained in a manner compatible with the requirements of the Constitution ...," and

to do so by subjecting the issue to "plenary federal review." A federal court

reviewing the admissibility of a confession is not bound by a state court finding of

voluntariness and has a "duty to make an independent evaluation of the record."

*Mincey v. Arizona,* 437 U.S. 385, 398 (1978). More specifically, this Court is not

bound by state court findings that the conduct of the interrogating officers was not

coercive. As Chief Judge Wallace stated in *Derrick v. Peterson,* 924 F.2d 813, 818

(9th Cir.1990), "we are obligated to conduct an independent review of the

'constitutional acceptability' of the ... interrogation...." This Court takes a fresh look

at whether the police used "objectively unacceptable methods to coerce [the

defendant] into waiving his right to silence...." *United States v. Wolf,* 813 F.2d 970,

976 n. 16 (9th Cir.1987). In this regard, "the admissibility of a confession turns as

much on whether the techniques for extracting the statements, as applied to *this*

suspect, are compatible with a system that presumes innocence and assures that a

conviction will not be secured by inquisitorial means as on whether the defendant's

will was in fact overborne." *Miller, supra,* 474 U.S. at 116 (emphasis in original).

Historical or subsidiary facts are treated differently, even though they may be

dispositive of a Constitutional claim. *Id.* at 113. Such findings as whether the police

in fact made the alleged threats are reviewed for clear error if made by a district court, and are presumed correct under section 2254(d) if made by a state court. "To be sure, subsidiary factual questions, such as ... whether in fact the police engaged in the intimidation tactics alleged by the defendant ... are entitled to the § 2254(d) presumption [of correctness]." *Id.* at 112 (citations omitted).

The standard of review does not change when the inquiry shifts from the voluntariness of the confession to the voluntariness of an asserted *Miranda* waiver. *Colorado v. Spring,* 479 U.S. 564, 573 (1987), makes it clear that "the inquiry whether a waiver is coerced 'has two distinct dimensions'":

> First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal *both* an uncoerced choice *and* the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986) (emphasis added)).

This Court reviews the voluntariness prong de novo: *Collazo v. Estelle*, 940 F.2d 411, 415 (9th Cir. 1991). Thus, as with the voluntariness of a confession, the voluntariness of a *Miranda* waiver is decided by first examining objectively the methods the police used to produce the waiver. *Id.*

The use of coercive tactics by state law enforcement officers to pressure an arrestee into talking has been prohibited since 1936. *Brown v. Mississippi,* 297 U.S.

278 (1936) (use of a defendant's coerced confession in a state criminal trial denies

due process). As the Supreme Court stated in *Culombe v. Connecticut,* 367 U.S. 568,

602 (1961):

> The ultimate test remains that which has been the only clearly established test in Anglo–American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? ... The line of distinction is that at which governing self-direction is lost *and compulsion, of whatever nature or however infused,* propels or helps to propel the confession. (emphasis added). Twenty-eight years later, and eighteen years before the investigation in this case, the privilege against self-incrimination was held applicable to the states via the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

Interrogation tactics need not be violent or physical in nature to be deemed

coercive. Psychological coercion is equally likely to result in involuntary statements,

and thus is also forbidden. *Mincey, supra,* 437 U.S. at 401, provides guidance:

> There were not present in this case some of the gross abuses that have led the Court in other cases to find confessions involuntary, such as beatings ... or "truth serums".... But the "blood of the accused is not the only hallmark of an unconstitutional inquisition." ... Determination of whether a statement is involuntary "requires more than a mere color-matching of cases." It requires careful evaluation of all the circumstances of the interrogation.

(citations omitted) (footnote omitted); *see also Spano,* 360 U.S. at 321 ("[A]s law

enforcement officers become more responsible, and the methods used to extract

confessions more sophisticated, our duty to enforce federal constitutional protections

does not cease.").

*Miranda* expresses concern about the compelling pressures that weigh upon a person in custody, pressures that can break a person's free will and cause that person to talk involuntarily. *Miranda v. Arizona,* 384 U.S. 436, 467 (1966). An officer must "scrupulously honor" a defendant's right to cut off questioning and not increase the pressure. Any minimally trained police officer should know such pressure is improper and likely to produce involuntary statements. *Collazo v. Estelle*, 940 F.2d 411, 417. In doing so, an officer engages in prohibited interrogation. *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980), points out "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (footnote omitted). *Innis* explicitly outlawed techniques likely to "'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Id.* at 299 (quoting *Miranda,* 384 U.S. at 457–58); *see also United States v. Gomez,* 927 F.2d 1530 (11th Cir.1991); *United States v. Anderson,* 929 F.2d 96 (2d Cir.1991).

*Edwards* made it clear beyond doubt that "an accused . . . having expressed his desire to deal with the police only through counsel, is *not* subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations

with the police." *Id.* at 484–85 (emphasis added). The goal of the Court in *Edwards* was "to protect an accused in police custody from being badgered by police officers[.]" *Oregon v. Bradshaw,* 462 U.S. 1039, 1044 (1983).

"[T]o a suspect who has indicated his inability to cope with the pressures of custodial interrogation by requesting counsel, any further interrogation without counsel having been provided will surely exacerbate whatever compulsion to speak the suspect may be feeling." *Arizona v. Roberson,* 486 U.S. 675, 686 (1988). Police must make "the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest." *Miranda, supra,* 384 U.S. at 469. As it turned out, and with considerable irony, not only did matters *not* go better for Collazo by talking without an attorney rather than remaining silent, but his statements were used to send him to prison, possibly for life.

Although *Miranda* "rights" are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected," *Tucker,* 417 U.S. at 444, when these measures are ignored, a suspect's Constitutional rights are directly affected. Failure to comply with *Miranda* aggravates an officer's coercive tactics. *See Clewis v. Texas,* 386 U.S. 707, 709 (1967) (*Miranda* transgressions are relevant on the issue of the voluntariness of a confession).

In certain circumstances, the Court has found affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege. See, e.g., *Lynumn v. Illinois,* 372 U.S. 528 [83 S.Ct. 917, 9 L.Ed.2d 922] (1963) (misrepresentation by police officers that a suspect would be deprived of state financial aid for her dependent child if she failed to cooperate with authorities rendered the subsequent confession involuntary); *Spano v. New York,* 360 U.S. 315 [79 S.Ct. 1202, 3 L.Ed.2d 1265] (1959) (misrepresentation by the suspect's friend that the friend would lose his job as a police officer if the suspect failed to cooperate rendered his statement involuntary).

Although the United States Supreme Court has long embraced a presumption against statutory retroactivity, for just as long it has recognized that, in many situations, a court should "apply the law in effect at the time it renders its decision," *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 711 (1974), even though that law was enacted after the events that gave rise to the suit. There is, of course, no conflict between that principle and a *presumption* against retroactivity when the statute in question is unambiguous. Chief Justice Marshall's opinion in *United States v. Schooner Peggy,* 1 Cranch 103, 2 L.Ed. 49 (1801), illustrates this point. Because a treaty signed on September 30, 1800, while the case was pending on appeal, unambiguously provided for the restoration of captured property "not yet *definitively* condemned," *Id.,* at 107 (emphasis in original), the Court reversed a decree entered

on September 23, 1800, condemning a French vessel that had been seized in American waters. The Court's application of "the law in effect" at the time of its decision in *Schooner Peggy* was simply a response to the language of the statute. *Id.,* at 109.

Even absent specific legislative authorization, application of new statutes passed after the events at suit is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive. *Landgraf v. USI Film Products*, 511 U.S. 244, 274 (1994). Thus, in *American Steel Foundries v. Tri–City Central Trades Council,* 257 U.S. 184 (1921), the Court held that § 20 of the Clayton Act, enacted while the case was pending on appeal, governed the propriety of injunctive relief against labor picketing. In remanding the suit for application of the intervening statute, the Court observed that "relief by injunction operates *in futuro,*" and that the plaintiff had no "vested right" in the decree entered by the trial court. 257 U.S., at 201,. See also, *e.g., Hall v. Beals,* 396 U.S. 45, 48 (1969).

The Court has regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed. *Landgraf*, 511 U.S. at 275. Thus, in *Bruner v. United States,* 343 U.S. 112, 116–117 (1952), relying on its "consisten[t]" practice, the Court ordered an action dismissed because the jurisdictional statute under which it

had been (properly) filed was subsequently repealed. See also *Hallowell v. Commons,* 239 U.S. 506, 508–509 (1916); *Assessors v. Osbornes,* 9 Wall. 567, 575 (1870). Conversely, in *Andrus v. Charlestone Stone Products Co.,* 436 U.S. 604, 607–608, n. 6 (1978), the Court held that, because a statute passed while the case was pending on appeal had eliminated the amount-in-controversy requirement for federal-question cases, the fact that respondent had failed to allege $10,000 in controversy at the commencement of the action was "now of no moment." See also *United States v. Alabama,* 362 U.S. 602, 604 (1960) (*per curiam*); *Stephens v. Cherokee Nation,* 174 U.S. 445, 478 (1899). Application of a new jurisdictional rule usually "takes away no substantive right but simply changes the tribunal that is to hear the case." *Hallowell,* 239 U.S., at 508. Present law normally governs in such situations because jurisdictional statutes "speak to the power of the court rather than to the rights or obligations of the parties," *Republic Nat. Bank of Miami,* 506 U.S., at 100 (Thomas, J., concurring).

Changes in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity. *Landgraf,* 511 U.S. at 275. For example, in *Ex parte Collett,* 337 U.S. 55, 71 (1949), the Court held that 28 U.S.C. § 1404(a) governed the transfer of an action instituted prior to that statute's enactment. The Court noted the diminished reliance interests in matters of procedure. *Id.* at 337 U.S. Because rules of procedure regulate secondary rather than

primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive. Cf. *McBurney v. Carson*, 99 U.S. 567, 569 (1879).

In *Thorpe v. Housing Authority of Durham,* 393 U.S. 268 (1969)*,* the Court held that an agency circular requiring a local housing authority to give notice of reasons and opportunity to respond before evicting a tenant was applicable to an eviction proceeding commenced before the regulation issued. *Thorpe* shares much with both the "procedural" and "prospective-relief" cases. See *supra,* at 1501–1502. Thus, the Court noted in *Thorpe* that new hearing procedures did not affect either party's obligations under the lease agreement between the housing authority and the petitioner, 393 U.S., at 279, and, because the tenant had "not yet vacated," the Court saw no significance in the fact that the housing authority had "decided to evict her before the circular was issued[.]" *Id.,* at 283. The Court in *Thorpe* viewed the new eviction procedures as "essential to remove a serious impediment to the successful protection of constitutional rights." *Ibid.* Cf. *Youakim v. Miller,* 425 U.S. 231, 237 (1976) (*per curiam*) (citing *Thorpe* for propriety of applying new law to avoiding necessity of deciding constitutionality of old one).

In *Bradley,* the District Court had awarded attorney's fees and costs, upon general equitable principles, to parents who had prevailed in an action seeking to desegregate the public schools of Richmond, Virginia. While the case was pending

before the Court of Appeals, Congress enacted § 718 of the Education Amendments of 1972, which authorized federal courts to award the prevailing parties in school desegregation cases a reasonable attorney's fee. The Court of Appeals held that the new fee provision did not authorize the award of fees for services rendered before the effective date of the amendments. The United States Supreme Court reversed. It concluded that the private parties could rely on § 718 to support their claim for attorney's fees, resting its decision "on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." 416 U.S., at 711.

Here, the offenses occurred on September 4, 2016, and Petitioner confessed to them on September 7, 2016. Penal Code § 859.5 it is said became effective on January 1, 2017, roughly four months later and four years before his judgment of sentence became final. The state court erroneously determined that P.C. § 859.5 does not apply retroactively. Pursuant to P.C. § 859.5,

> [A] custodial interrogation of any person, including an adult or a minor, who is in a fixed place of detention, and suspected of committing murder, as listed in Section 187 or 189 of this code, or paragraph (1) of subdivision (b) of Section 707 of the Welfare and Institutions Code, shall be electronically recorded in its entirety. A statement that is electronically recorded as required pursuant to this section creates a rebuttable presumption that the electronically recorded statement was, in fact, given and was accurately recorded by the prosecution's witnesses, provided that the electronic recording was made of the

custodial interrogation in its entirety and the statement is otherwise admissible.

P.C. § 859.5(a).

As will be addressed further in the subsequent sections, Petitioner was in police custody and interrogated for more than an hour all the while denying his involvement in the shooting. Parts of his confession were recorded, but not all of it. The recordings do not contain the conversation that occurred between Petitioner and Detective Scott where Petitioner implored Scott to let him see his grandfather and Scott responded that he would let Petitioner see his grandfather only if Petitioner told him what happened. It is unknown what other conversations occurred that were not recorded in derogation of Petitioner's due process rights.

P.C. § 859.5 was passed in response to the not uncommon phenomenon of false confessions given, *inter alia*, in inherently and extrinsically coercive situations. The desire to prevent against false confessions is reinforced in the doctrine of corpus delicti. *People v. Davis* (2008) 168 Cal.App.4th 617, 635 (the main purpose of the rule is to prevent a person from being convicted of a crime that never happened). P.C. § 859.5 contains neither a statement that it is to apply retroactively nor a savings clause that it is to be applied only prospectively. Given that this statute reduces the likelihood that an individual will be convicted of murder by virtue of an involuntary confession being admitted into evidence, it reduces criminal punishment and must

be applied retroactively to all cases whose judgments are not yet final. There was no legitimate reason to subject Petitioner to increased punishment based on a technicality, especially when combined with the rule of lenity. *People v. Manzo* (2012) 53 Cal.4th 880 (when a criminal statute is susceptible of two reasonable interpretations, the rule of lenity requires a court to prefer the interpretation that is more favorable to the defendant).

Additionally, as further discussed throughout this memorandum, Petitioner's confession was not voluntary. The state court did not establish the P.C. § 859.5 exceptions, namely voluntariness or that police contemporaneously recorded their reasons for not recording the confession or that they demonstrated it would not have been feasible. Accordingly, the state court erred in resolving this claim against Petitioner.

## II. Claim Two—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to the Trial Court's Erroneous Admission of Petitioner's Involuntary Confession.

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

During his custodial interrogation, Petitioner asked Scott if he could see his grandfather and Scott replied that he could not. In response, Petitioner stated that he would tell Scott what actually happened on the day of the shooting if he could see his grandfather. Scott told Petitioner to tell him what happened first and then Petitioner could see his grandfather. Petitioner then accepted Scott's proposal by confessing. Had Scott not improperly promised to allow Petitioner to see his grandfather in return for confessing to the crime, Petitioner would not have confessed. Scott knew that Petitioner only cared about his daughter and his grandfather and knew that he was his grandfather's caretaker. Petitioner's grandfather needed such care that Petitioner was not able to leave the house.

Scott understood his promise to allow Petitioner to see his grandfather would induce Petitioner to confess although Petitioner had previously invoked his *Miranda* rights since Petitioner expressly indicated that it would induce him to do so. Scott was not lawfully permitted to continue to pressure Petitioner once Petitioner invoked his right to remain silent. Petitioner had steadfastly maintained his innocence up to that point and then invoked his right to remain silent. Scott did not re-*Mirandize*

Petitioner after Petitioner invoked his right to remain silent nor did he cease questioning. Without his confession, Petitioner's conviction would not have stood due to the unreliability of the testifying felons. Indeed, the evidence suggested that it was Lou, not Petitioner, who was the assailant due to a stronger motive and opportunity. Accordingly, the state court erred in resolving this claim against Petitioner.

**III. Claim Three—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to the Trial Court's Voluntary Intoxication Jury Instruction.**

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

"When considering an allegedly erroneous jury instruction in a habeas proceeding, an appellate court first considers whether the error in the challenged

instruction, if any, amounted to 'constitutional error.'" *Evanchyk v. Stewart,* 340 F.3d 933, 939 (9th Cir. 2003) (internal quotation marks and citation omitted). "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." *Middleton v. McNeil,* 541 U.S. 433, 437 (2004). But "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Id.* The appropriate inquiry "is whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." *Id.,* quoting *Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (internal quotation marks omitted). "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id.,* quoting *Boyde v. California,* 494 U.S. 370, 378 (1990) (internal quotation marks omitted).

"If the charge as a whole is ambiguous, the question is whether there is a 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Id.,* quoting *Estelle, supra,* at 72. But this "reasonable likelihood" inquiry does not apply when the disputed instruction is erroneous rather than ambiguous. *See Boyde, supra,* at 380 (distinguishing situations when the test would apply from those where the instruction at issue was "concededly erroneous [or] found so by a court"); *see also Ho v. Carey,* 332 F.3d 587, 592 (9th Cir. 2003).

At trial, there was evidence that Petitioner was intoxicated to warrant the voluntary intoxication instruction vis-à-vis the elements of premeditation and deliberation required for first-degree murder. Although the trial court was correct in instructing the jury that it could consider evidence of voluntary intoxication in determining whether Petitioner acted with intent, it failed to instruct the jury that it could also consider this evidence regarding whether Petitioner acted in a premeditated or deliberate manner, or with malice. P.C. § 29.4(b), *People v. Roldan* (2005) 35 Cal.4th 646, 715. Further, and more importantly, the trial court instructed the jury that Petitioner acted with deliberation and premeditation, thus removing essential elements of the offense from the jury's consideration and stripping government of its burden to establish these elements beyond a reasonable doubt.

Since the claim was an instructional error, it is governed by *Neder v. United States*, 527 U.S. 1 (1999), and not *Chapman v. California*, 386 U.S. 18 (1967), the former of which requires the court to conduct a thorough examination of the record to determine beyond a reasonable doubt that the jury verdict would have been the same absent the error. Where the defendant contested the omitted element and raised sufficient evidence to support a contrary finding, the error is not harmless. *Id*.

The uncontroverted evidence established that Petitioner was intoxicated before and during the incident as he had been on a two-day bender leading up to the shooting. Had the jury been properly instructed that Petitioner's voluntary

intoxication could negate the elements of premeditation and deliberation and the presence of malice, it is likely that the jury would have at the very least deadlocked, if not acquitted, and a mistrial been declared. This is further reinforced by the fact that Petitioner's confession was involuntary and essentially unwarned. Accordingly, the state court erred in resolving this claim against Petitioner.

## IV. Claim Four—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Erroneously Instructed the Jury on Flight.

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

Because Petitioner returned to his home right next door to the crime scene following the shooting, the trial court instructed the jury that Petitioner fled from the scene. This instruction was patently unsupported by the evidence given that

returning to one's home to carry on as one otherwise normally would is not flight from the scene of the crime. That an individual does not remain at the scene of a crime and instead goes about his business is not evidence of flight, i.e., the willful concealment of oneself to avoid detection. Everyone present at the scene of the crime knew that Petitioner lived right next door and law enforcement thus knew where he could be found. Petitioner did not run headlong or exhibit nervousness. Moreover, witnesses testified that at one point, Petitioner returned to the scene. Petitioner went to bed following the incident, the consummate act of going about his business. Petitioner was prejudiced due to this error to the same extent and for the same reasons contained above. Accordingly, the state court erred in resolving this claim against Petitioner.

## V. Claim Five—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to Trial Counsel's Ineffectiveness.

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below,

Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

Petitioner was deprived of his Sixth and Fourteenth Amendment rights to effective assistance of counsel. The Sixth Amendment guarantees a criminal defendant's right to the effective assistance of counsel. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (*per curiam*). This right is violated when defense counsel's performance falls below an objective standard of reasonableness under the prevailing professional norms, and counsel's errors seriously prejudice the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Under both the United States Constitution and the California Constitution, a defendant's right to counsel does not merely consist of a right to "some bare assistance" of counsel; rather, a defendant has a right "to *effective* assistance." *People v. Ledesma* (1987) 43 Cal.3d 171, 215 (emphasis in original).

In order to demonstrate ineffective assistance of counsel, Petitioner first "must show that counsel's performance was deficient" and second "must show that the deficient performance prejudiced the defense." *Id*.

In order to establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, *supra*, at 688. The "prejudice" component "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or

the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

To demonstrate prejudice, Petitioner must show that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, *supra*, at 694. *See also People v. Patterson* (2017) 2 Cal.5th 885, 900; *In re Marquez* (1992) 1 Cal.4th 584, 603.

In this case, trial counsel failed to render effective assistance at trial in circumstances where trial counsel failed to adequately investigate the case, including in particular failing to adequately investigate the evidence indicating that Lou was the actual perpetrator as well as the evidence indicating that Petitioner's alleged confession was coerced; trial counsel failed to adequately engage and consult with necessary experts, including in particular experts regarding the forensic evidence and experts regarding coerced confessions, or to adduce such expert evidence at trial; and counsel failed to bring a *Pitchess* motion to investigate the role of police misconduct in Petitioner's case.

In fact, throughout trial, Petitioner struggled to effectively communicate with his counsel. Petitioner, who was taking mood stabilizing medications for bipolar disorder and anxiety, understood only some of the proceedings against him. Yet when Petitioner would ask his counsel questions or seek clarifications, trial counsel

simply told Petitioner "let me do my job" but did not answer his questions or address his concerns. (Exhibit A, at ¶ 5.)

### a. Trial Counsel Failed to Adequately Investigate and Evidence that Lou was the Actual Shooter and That Petitioner's Alleged Confession was Coerced.

Trial counsel failed to adequately investigate and adduce evidence that would have shown that Lou was the actual shooter and that Petitioner's alleged confession was coerced. (*See, e.g.*, Exhibit A, at ¶ 6.)

It is well settled that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, *supra*, at 691. Counsel has a "duty to conduct careful factual and legal investigations and inquiries with a view to developing matters of defense in order that he may make informed decisions on his client's behalf both at the pleading stage and at trial." *In re Saunders* (1970) 2 Cal.3d 1033, 1044-45 (citations omitted).

> We have held that "a lawyer who fails adequately to investigate, and to introduce into evidence, evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance."

*Riley v. Payne*, 352 F. 3d 1313, 1318 (9th Cir. 2003).

Here, trial counsel failed to adequately investigate and take advantage of a range of favorable evidence, including in particular the fact that Lou was captured on his own surveillance leaving the crime scene with a firearm in his hand that *did*

*not* match the description of the supposedly "inoperable" firearm that Lou and Fernandez only later claimed Fernandez had given to Lou. Defense counsel, however, failed to adequately investigate and adduce evidence that it was Lou, and not Petitioner, who was captured on surveillance video exiting the victim's property with a firearm. Counsel further failed to adequately take advantage of Lou's inconsistent and often false statements, especially where Lou initially claimed to not have been home at the time of the shooting and subsequently changed that story several times when confronted by contrary evidence. Indeed, it was only in court that Lou for the first time claimed to have seen Petitioner collecting spent shells on the victim's property—a claim no other witness made, and a claim Lou himself had not previously made.

Counsel likewise failed to fully and adequately investigate and take advantage of Lou's changing claims regarding his own possession of a 9-millimeter Glock firearm—a firearm that was consistent with the weapon used in the shootings—where Lou did not initially disclose his ownership of such a weapon, later claimed it had been stolen but not reported, and still later claimed to have given it to Petitioner.

Counsel similarly failed to adequately investigate and take advantage of the changing and inconsistent statements of other witnesses; the close relationships between and among the witnesses, which pointed to a motive for them to conspire

to protect Lou at Petitioner's expense; and the extensive criminal histories of the witnesses, including in particular Lou's testimony pursuant to a grant of immunity.

Likewise, defense counsel failed to adequately investigate or take advantage of Petitioner's alleged confession in circumstances where Petitioner offered that statement only under coercion and out of fear for his grandfather's safety and wellbeing, and where the investigating officers failed to record significant portions of their interactions with Petitioner. Petitioner was the caretaker for his elderly grandfather and throughout his interrogation, Petitioner was deeply concerned for his grandfather's wellbeing because he had left his grandfather alone and unattended. (Exhibit A, Petitioner's declaration, at ¶ 2.) The interrogating detective was well aware of these issues (1RT 33-34) as well as the fact that Petitioner's primary concern was that "my grandpa comes first." (1CT 185.) Yet throughout the interrogation, the investigating officers failed to address those concerns or even to permit Petitioner to speak with his grandfather to check on him. (Exhibit A, at ¶ 3; *see also* Court of Appeal summary of relevant facts, *supra* at Petition ¶ 52.) Petitioner understood from the statements of Detective Scott that, if Petitioner were to confess to the shooting, he would be permitted to check on the wellbeing of his grandfather. Petitioner mistakenly believed that he had invoked his *Miranda* rights and therefore any subsequent statement could not be used against him. Petitioner therefore offered Detective Scott a fake confession for the sole purpose of assuring

his grandfather's safety and wellbeing. (Exhibit A, at ¶ 4.) The subsequent conversation was recorded piecemeal, in four video clips on a cell phone. Petitioner's counsel, however, failed to adequately investigate and adduce evidence regarding the coercion that resulted in Petitioner's alleged confession. For instance, counsel failed to adequately interview potential witnesses or adduce evidence of Petitioner's role as his grandfather's caretaker and the intense concern Petitioner had for his grandfather's wellbeing when he was left unattended.

Counsel's performance was thus objectively deficient because counsel failed to undertake the necessary investigation and adequately adduce the relevant evidence to develop full and fair defense. There can be no tactical or strategic reason for these failures, which left counsel unable to make an informed tactical or strategic decision. (*See, e.g., Strickland, supra*, at 691.) Petitioner was prejudiced by the deficient performance of his counsel, which deprived Petitioner of an opportunity to present a full and fair defense.

Counsel's failure to adequately investigate and adduce evidence with respect to these issues thus amounts to ineffective assistance of counsel. Accordingly, Petitioner respectfully submits that this Petition for a Writ of Habeas Corpus should be granted.

**b. Trial Counsel Failed to Consult, Retain, or Call at Trial Necessary Expert Witnesses.**

Trial counsel also failed to consult with, retain, or call at trial necessary expert witnesses who would have provided important insight and testimony regarding the mental health and medical issues relevant to this matter.

Courts have repeatedly found that defense counsel's failure to introduce expert evidence to support a defense theory constitutes deficient performance in circumstances where defense counsel did not make sufficient inquiries to make an informed tactical decision. (*In re Cordero* (1988) 46 Cal.3d 161; *People v. Ledesma* (1987) 43 Cal.3d 171; *People v. Frierson* (1979) 25 Cal.3d 142). In fact, in many of the cases where a court has ruled that a defendant was deprived of his or her constitutional right to the effective assistance of counsel or where the court ordered an evidentiary hearing, the basis for the claim stemmed from an inadequate investigation into forensic evidence and/or expert testimony. (*People v. Day* (1992) 2 Cal.App.4th 405 [defense counsel's failure to investigate expert testimony]; *Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998) [defense counsel's failure to investigate PTSD]; *In re Sixto* (1989) 48 Cal.3d 1247 [defense counsel failed to adequately test for PCP usage and blood alcohol level]; *Baylor v. Estelle,* 94 F.3d 1321 (9th Cir. 1996)   [Defense counsel's failure to introduce evidence of inconsistent blood type]; *Cam v. Calderon* 165 F.3d 1223 (9th Cir. 1999) [evidentiary hearing ordered with respect to defense counsel's failure to investigate neurotoxins exposure]; *Schell v. Witek,* 218 F.3d 1017 (9th Cir. 2000) [evidentiary

hearing ordered with respect to defense counsel's failure to consult an independent fingerprint expert].) Likewise, the failure to adequately obtain professional or expert testing or analysis of physical evidence constitutes ineffective assistance of counsel where counsel has failed to undertake an adequate investigation. (*See, e.g., Strickland*, *supra*, at 691 [noting counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"].)

Here, trial counsel failed to consult with, retain, or call at trial any expert who could provide advice, guidance or testimony regarding forensic evidence. For instance, counsel failed to consult with a fingerprint expert or to seek fingerprint testing of the physical evidence recovered from the scene despite the fact that such fingerprint evidence could have demonstrated that it was Lou, and not Petitioner, who was the actual shooter. Nor did counsel consult with or retain other forensic experts who could have provided similar expertise, such as experts regarding ballistics, gunshot residue, or the surveillance video.

Nor did trial counsel consult with or call at trial an expert witness who could have provided testimony regarding Petitioner's alleged confession, including in particular further information and context that would inform the jury regarding the likelihood and risks of a coerced confession, particularly under circumstances where Petitioner was deeply concerned for the wellbeing of his grandfather.

The dangers of a false confession in the face of coercive tactics have long been recognized in psychological research. *See, e.g.*, Saul M. Kassin & Katherine L. Kiechel, *The Social Psychology of False Confessions: Compliance, Internalization and Confabulation*, 7 Psychol. Sci. 125 (1996). The Innocence Project reports that, of 258 DNA exonerations of people wrongly convicted in 2009, roughly 25% had given false confessions. *See https://falseconfessions.org/fact-sheet/*. In fact, as of January 1, 2017—four months after Petitioner's interrogation but approximately five months prior to his trial—Penal Code § 859.5 took effect, requiring that custodial interrogation of a person suspected of murder be electronically recorded in its entirety. The purpose of this legislation was to avoid false confessions. (*See, e.g.*, 2016 Cal. Legis. Serv. Ch. 791, section 1(a) and (b), (S.B. 1389).) In other words, had Petitioner's interrogation occurred only a few months later his false confession would not have been admissible because the legislature had determined that the officers' failure to fully and completely record that interrogation bore too much risk of a false and coerced confession.

Petitioner's trial counsel, however, failed to seek the services of an appropriate expert who could advise both counsel and the jury of the well-known, well-documented and well-researched risks of a coerced false confession, particularly given the known circumstances where Petitioner feared for the safety

and wellbeing of the grandfather for whom he was responsible and who had been left alone and unattended.

By failing to consult with or call at trial necessary experts, counsel's performance was objectively deficient by any measure. There can be no tactical or strategic reason for counsel's failures as, again, counsel's failure to adequately investigate and determine the relevant facts and the available evidence left counsel unable to make an informed tactical or strategic decision. (*See, e.g., Strickland*, *supra*, at 691.)

Petitioner was prejudiced by the foregoing instances of deficient performance by his counsel. Due to counsel's failure to seek appropriate expert guidance and evidence, counsel failed to appreciate the significance and relevance of these issues to Petitioner's defense or to properly advise the jury regarding these issues.

Counsel's failure to adequately investigate and prepare for trial, including counsel's failure to consult with or call necessary experts or to properly seek relevant examination and testing of key evidence, such as seeking fingerprints or other forensic evidence, thus amounts to ineffective assistance of counsel. Accordingly, Petitioner respectfully submits that this Petition for a Writ of Habeas Corpus should be granted.

**c. Trial Counsel Failed to Investigate the Propriety of the Investigation Against Petitioner or to file a *Pitchess* motion.**

At the time of the shooting and the initial investigation, the Chief of Police of the Delano Police Department was Mark DeRosia. During the same month that Petitioner was convicted, that police chief was fired "for mysterious reasons." (*See* Exhibit B, articles regarding termination of Chief DeRosia.) Again, however, Petitioner's counsel had brought no *Pitchess* motion nor taken any other steps to investigate the propriety of the investigation against Petitioner. (Exhibit A, at ¶ 7.)

Petitioner's trial counsel thus failed to adequately seek to investigate the law enforcement officers involved in Petitioner's case or to obtain discovery of those officers through a *Pitchess* motion. It was therefore only after Petitioner's trial that Petitioner learned the chief of police had been suddenly fired "for mysterious reasons," but Petitioner was unable to gain further information regarding the circumstances of the wrongdoing that resulted in that termination. Had counsel properly sought a *Pitchess* motion prior to trial, a proper response would likely have disclosed important information regarding the terminated chief of police and the tactics and approaches that occurred under his leadership. (*See* Exhibit B.) Particularly in light of the questionable circumstances surrounding Petitioner's alleged confession, such information would have been of key importance to Petitioner's defense.

It was objectively deficient for trial counsel to fail to bring a *Pitchess* motion, particularly in light of the facts of the case. There can be no strategic nor tactical

reason for counsel's failure to adequately attempt to investigate or obtain this information. It was error for counsel to fail to even attempt to investigate the Detective's record of misconduct. (*See, e.g., Strickland*, *supra*, at 691 [noting counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"].) Petitioner was prejudiced by his counsel's failure. Petitioner was deprived of an opportunity to fully and fairly present his defense because he was unable to meaningfully attack the credibility of the investigation at trial.

Accordingly, this Petition for a Writ of Habeas Corpus should be granted on this basis.

## VI. Claim Six—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to His Claim for Actual Innocence.

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below,

Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

In *Herrera v. Collins,* 506 U.S. 390 (1993), a majority of the Supreme Court assumed, without deciding, that execution of an innocent person would violate the Constitution. The Supreme Court did not specify what showing would be required for a habeas petitioner to make out a successful freestanding claim of actual innocence. The Court stated only that the threshold would be "extraordinarily high," and that the showing would have to be "truly persuasive." *Herrera,* 506 U.S. at 417; *accord id.* at 426 (O'Connor, J., concurring). The Court found it unnecessary to be more specific because Herrera's showing was unconvincing under any standard. *See id.* at 417–19; *accord id.* at 424–27 (O'Connor, J., concurring).

Justice White stated that the required showing would have to be, at the bare minimum, the same as that required to invalidate a conviction because of insufficient evidence under *Jackson v. Virginia,* 443 U.S. 307, 324 (1979), taking into account *all* the evidence, including both the newly proffered evidence and the evidence at trial. *See Herrera,* 506 U.S. at 429 (White, J., concurring in the judgment). Justice White, however, addressed only the minimum required showing; he did not find it necessary to decide finally what the threshold would be. *See id.*

The United States Court of Appeals for the Ninth Circuit concluded that the *Herrera* majority's statement that the threshold for a freestanding claim of innocence

would have to be "extraordinarily high," *id.* at 417; *accord id.* at 426 (O'Connor, J., concurring), contemplates a stronger showing than insufficiency of the evidence to convict. *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997). It therefore declined to adopt the modified *Jackson* standard. *Id.* To be entitled to relief, a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt and must affirmatively prove that he is probably innocent. *See Herrera,* 506 U.S. at 442–44 (Blackmun, J., dissenting).

Requiring affirmative proof of innocence is appropriate, because when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled to relief despite a constitutionally valid conviction. *Carriger*, 132 F.3d at 476. As Justice Blackmun explained,

> conviction after a constitutionally adequate trial strips the defendant of the presumption of innocence. The government bears the burden of proving the defendant's guilt beyond a reasonable doubt, but once the government has done so, the burden of proving innocence must shift to the convicted defendant. The actual-innocence inquiry is therefore distinguishable from review for sufficiency of the evidence, where the question is not whether the defendant is innocent but whether the government has met its constitutional burden of proving the defendant's guilt beyond a reasonable doubt. When a defendant seeks to challenge the determination of guilt after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence, not just raising doubt about his guilt.

*Herrera,* 506 U.S. at 443 (Blackmun, J., dissenting); *accord id.* at 399–400 & 407 n. 6 (majority opinion) (noting that a valid conviction strips petitioner of the presumption of innocence and attaches a presumption of guilt). In light of the

presumption of guilt that attaches after a constitutionally valid conviction, "it is fair to place on [a petitioner asserting a *Herrera* claim] the burden of proving his innocence, not just raising doubt about his guilt." *Id.* at 443 (Blackmun, J., dissenting).

Here, Petitioner is legally, factually, and actually innocent of the offenses and special allegations for which he was convicted and sentenced. Petitioner incorporates as if fully set forth herein all of the facts and argument set forth above and in the foregoing Petition.

Accordingly, it is respectfully submitted that this Petition for a Writ of Habeas Corpus should be granted on this ground.

## CONCLUSION

WHEREFORE, based on the foregoing, this Honorable Court should grant Petitioner's Petition for Writ of Habeas Corpus.

Dated: February 4, 2022                    Respectfully submitted,

                                            SPOLIN LAW P.C.


                                                 /s/ Aaron Spolin
                                    By:    _____
                                            Aaron Spolin
                                            Attorney for the Petitioner

# CERTIFICATE OF SERVICE

Case Name: Carlos Razo Cervantes on Habeas Corpus

I hereby certify that on February 11, 2022, I electronically filed the following document with the Clerk of the Court using the CM/ECF system:

**Verified Petition for Writ of Habeas Corpus; Memorandum of Points and Authorities**

I also served Petitioner's **Verified Petition for Writ of Habeas Corpus; Memorandum of Points and Authorities**, by causing to be placed a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail, addressed as follows:

> LEGAL MAIL
> Carlos Razo Cervantes, CDCR No. BH1279
> Kern Valley State Prison
> Housing: ASU 1-170-L
> P.O. Box 5104
> Delano, CA 93216
> **Via US Mail**

I declare under penalty of perjury that the foregoing is true and correct, and this declaration was executed at Los Angeles, California, on February 11, 2022.

/s/ Aaron Spolin

_____

Aaron Spolin