AARON SPOLIN (State Bar No. 310379)
ClientMail@SpolinLaw.com
SPOLIN & DUKES P.C.
11500 W. Olympic Blvd., Suite 400
Los Angeles, CA 90064
(310) 424-5816
(310) 312-4551

Attorney for Petitioner

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF CALIFORNIA**

CARLOS RAZO CERVANTES,

   Petitioner,

 vs.

BRIAN CATES, as Acting Warden, California Correctional Institution,

   Respondent.

Case No.: 1:22-CV-00175-ADA-SKO

**Petitioner Carlos Razo Cervantes' Verified First Amended Petition for Writ of Habeas Corpus by a Person in State Custody Under 28 U.S.C. § 2254.**

Petitioner, Carlos Razo Cervantes (hereinafter "Petitioner"), through undersigned counsel, files this Verified First Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, and in support thereof, avers as follows:

**A. Procedural History**

1. Petitioner is Carlos Razo Cervantes.

VERIFIED FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS - 1

2. Petitioner is unlawfully confined in the California Correctional Institution pursuant to a judgment of the Superior Court of California for Kern County in *People v. Cervantes,* case number BF165489A.

3. Petitioner is currently unlawfully confined in the California Correctional Institution, 24900 Highway 202, Tehachapi, CA 93561.

4. Brian Cates is the acting warden of the California Correctional Institution.

5. On March 7, 2017, the People filed an information charging Petitioner with two counts of murder. (P.C. § 187(a).)

6. As to both counts, the People alleged the multiple murder (P.C. § 190.2(a)(3)), personal and intentional firearm discharge causing great bodily injury (P.C. § 12022.53(d)), and personal firearm discharge during the commission of murder (*Id*. at § (c)) enhancements.

7. Petitioner's jury trial commenced on June 28, 2018.

8. On July 10, 2018, the jury found Petitioner guilty as charged and found true the enhancements.

9. On August 9, 2018, the trial court sentenced Petitioner to two consecutive terms of life imprisonment without the possibility of parole followed by a consecutive, indeterminate term of 50 years to life imprisonment.

10. That same day, Petitioner filed a timely notice of appeal.

11. On October 14, 2020, the California Court of Appeal for the Fifth District affirmed Petitioner's judgment. *People v. Cervantes* (2020) 55 Cal.App.5th 927.

12. On November 17, 2020, Petitioner filed a petition for review with the California Supreme Court which was denied on January 13, 2021.

13. On January 18, 2022, Petitioner filed a Petition for California Writ of Habeas Corpus in the Kern County Superior Court at Case Number HC 17164A, which was denied on March 2, 2022.

14. On February 11, 2022, Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Document 1) and a Motion to Stay (Document 3) in this Honorable Court.

15. On September 2, 2022, this Honorable Court granted Petitioner's motion for a stay and dismissed grounds five and six without prejudice pending Petitioner's exhaustion of those claims in state court.

16. On September 12, 2022, Petitioner filed a Petition for California Writ of Habeas Corpus in the California Court of Appeal for the Fifth Appellate District at Case Number F084925.

17. On November 30, 2022, the California Court of Appeal for the Fifth Appellate District directed the Attorney General to file an Informal Response on or before December 20, 2022.

18. An Informal Response was filed on January 18, 2023, and Petitioner's Reply was filed on February 27, 2023.

19. On March 2, 2023, the petition in the Court of Appeal was denied.

20. On May 15, 2023, Petitioner filed a California Petition for Habeas Corpus in the California Supreme Court.

21. On August 9, 2023, the California Supreme Court denied Petitioner's petition.

**B.   Factual History**

22. The following facts are largely replicated from Petitioner's opening brief on direct appeal:[1]

### A. Prosecution

Jeffrey Villegas (Jeff) lived at 137 West 15th Street in Delano. (2RT 76.) Jose Fernandez and his girlfriend, Anna Zavala, were roommates of Jeff's and shared his house but did not have a key or the code to the lock on the house. (3 RT 221, 227-228, 234, 246.) Petitioner lived next door to Jeff on the west side of Jeff's house. (3RT 143-144, 173, 287.) Lou lived next door to Jeff on the east side of Jeff.[2] (3RT 143, 173, 287.)

In the late afternoon/early evening hours on September 4, 2016, Petitioner, Lou, Roland Claro, Roberto Chavez, and a neighbor named Jesus Herrera were having a conversation in front of Petitioner's house on West 15th Street in Delano. (3RT 144-145, 169, 276, 299-300.) Petitioner was on his side of the fence and the others were outside the fence on the street side on the sidewalk. (3RT 170, 277, 285, 299.) Petitioner wanted to know how he could get ahold of Jeff. He wanted a phone number where he could reach him at Chavez's brother's house. (3RT 278-279.) He wanted Chavez to call him. (3RT 279.) Petitioner said something about whether Chavez would go to Jeff's house with him and make some "quick money as a gesture," a possible reference to taking things from Jeff. (3RT 279-280.) Chavez declined. (3RT 279-280.) Petitioner did not mention any money Jeff owed him, although Jeff owed Petitioner some $2,100 for work Petitioner had done for him. Despite several requests by Petitioner to Jeff, Jeff still had not paid him. (3RT 280, 1CT 196, 197, 198-199, 213, 214.)

---

[1] Many of the witnesses and the victims have first or nicknames by which they are most frequently referred to in the trial. For ease of reference, they are: Jeffrey Villegas—Jeff; Jose Ceja—Chema (3RT 159, 225); Lounita Villaruz—Lou or Luo; Jose Fernandez—Beaner (3 RT 221, 233); Roland Claro—Roland; Jesus Herrera—apparently Chuy (3RT 276); and Roberto Chavez—Bobby (3RT 300.) Because the surnames of Jeffrey Villegas and Lounita Villaruz are somewhat similar, Petitioner will refer to them as Jeff and Lou, the way they are most often referred to in the record to avoid confusion. No disrespect is intended.

[2] Lou testified under a grant of use immunity from the prosecutor. (3RT 139-140, 169, 215.)

The conversation between the men in front of Petitioner's house lasted some 30 minutes to an hour. (3RT 170, 289.) Petitioner had been drinking "about two days straight" and appeared to be drunk or tipsy. (3RT 146, 178, 210, 278, 286, 310.) During the conversation Claro left and went two houses over to the front yard of Lou's house to use Lou's WIFI connection. (3RT 150, 151-152, 170, 171, 286, 299, 311-312.) Sometime before the conversation ended, Jose Ceja went into Jeff's yard looking for Jeff and waited in the front of Jeff's house. (3RT 159, 160, 179, 288.)

Jeff pulled up to his house next door in his Chevy van just before the people disbursed in front of Petitioner's house, exited his vehicle, and walked onto his property in the direction of the front door. (3RT 146, 179, 289.) While still in front of Jeff's as the men left, Chavez, while heading to Lou's, looked back and saw Petitioner enter Jeff's property with a squarish, black object in his hand that may have been a gun that he removed from his waistband. (3RT 281, 290, 291, 293, 296.) Chavez heard a clicking sound of a gun being "racked" as Petitioner went into the property in the direction of the front door. (3RT 281-283, 287.) Chavez may have told police he heard Petitioner say, "Hey, bitch, you want to talk shit about me?" (3RT 283.)

As the men continued on their way, Lou was walking into the yard of his own house. (3RT 146.) Chavez was walking ahead of Lou several feet and about to sit down where Claro was sitting at a patio table in Lou's front yard. (3RT 174, 282, 286-287, 302.) Apparently while still on the sidewalk in front of Petitioner's, Lou heard Petitioner say, with respect to Jeff, "I'm gonna get him." (3RT 145- 146, 205, 210, 211.) Petitioner had become agitated because Jeff had pulled up. (3RT 146.) While in Lou's driveway or yard after leaving the front of Petitioner's house, Lou and Chavez heard Jeff yell, "I didn't say anything. I didn't say anything" or "I didn't say anything, Carlos." (3RT 147, 180, 276, 283.) Petitioner had told Chavez sometime before that he wanted to get Jeff because Jeff owed him money. (3RT 284.)

Lou, Chavez, and Claro heard several gunshots about that time. (3RT 147-148, 206, 276-277, 283, 302.) According to Chavez and Claro, the first gunshots happened before Jeff said, "I didn't say anything." (3RT 292, 313, 314.) They each had heard two shots, then Jeff scream that he did not say anything or "No. No, I wasn't talking shit." Then, according to Claro, he heard two more shots, and then according to both Claro and Chavez, another four shots in a row. (3RT 303, 318.)

Lou was about three steps into his driveway when he heard the shots. (3RT 174, 205.) Jesus was walking close to Lou but on the sidewalk at the time heading toward his house further east. (3RT 175-176, 315.) Chavez was in

VERIFIED FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS - 5

Lou's front yard approaching Claro. (3RT 291-292.) Claro was sitting down in Lou's front yard at a patio table near the front door when the shots were heard. (3RT 174-175, 301.) Soon after hearing the shots, Chavez and Claro saw Petitioner leaving Jeff's property in the direction of his own house. (3RT 284, 304, 318, 4RT 341.)

After the gunshots, Lou stayed in the front of the house for a time. (3RT 181.) Chavez left immediately after the shots. (3RT 292, 313, 315-316.) According to Claro, Lou put back a dog that had gotten loose from Petitioner's yard. (3RT 305, 316-317, 318.) Lou then got into his pickup truck that was parked in front of Petitioner's or Jeff's on the sidewalk and drove around the block, taking the long way, and came back to his house a couple of minutes later. (3RT 181, 183- 186, 208-209, 305-306, 318.) Claro stayed in the yard. (3RT 181, 183.) When Lou returned, Claro was still there but Chavez had gone. (3RT 186-187.)

Lou then went into his house with Claro and checked on his mother. (3RT 187-188, 306.) After some time, Lou went outside to see what was going on. (3RT 187-188.) Claro was in the restroom using his computer. (3RT 188, 306-307, 319.) Neither Lou nor Claro called 9-1-1. (3ET 188, 320, 4RT 339.) Both Lou and Claro heard Fernandez and/or Anna Zavala calling "Lou, Carlos" for help. (3RT 188-189, 307-308.) Claro went outside and left shortly thereafter. (3RT 308.)

Fernandez and Zavala returned to Jeff's in their vehicle when it was getting dark after being out most of the day. (3RT 222, 234.) After pulling into Jeff's driveway, they stayed in the vehicle a few minutes. (3RT 222.) Zavala exited the vehicle and saw Jose Ceja underneath the diesel truck on the ground. (3RT 223, 229, 236) She thought he was asleep. (3RT 223.) She called out to him, but he did not answer. (3RT 223.) She told Fernandez. (3RT 223, 235.) Fernandez exited his vehicle to check. (3RT 223-224246-247.) Fernandez called Ceja's name, but he did not respond. (2RT 236.)

Fernandez pulled Ceja from underneath the diesel tractor-trailer/semi, gave him CPR and tried to resuscitate him because he was not breathing. (2RT 87, 3RT 158, 159, 165, 166, 224-225, 235-237.) Zavala remained in the car. (3RT 210.) Fernandez' efforts to revive Ceja were unsuccessful. (3RT 225, 236.) Fernandez also saw Jeff's body on the front porch, but he did not perform CPR on him because he "knew he was gone" already. (3RT 238.)

Zavala called 911 after seeing Jeff by the front door on the ground. (3RT 226.) Fernandez and Zavala then called out to the neighbors, Lou and Petitioner. (3RT 225, 239, 217-218.) Lou came over to the fence between his

property and Jeff's or went on Jeff's property. (3RT 158, 225, 239, 189-190, 217-218.) Lou observed Fernandez giving mouth to mouth to Ceja and pouring water on him. (3RT 190.) Neither Zavala nor Fernandez recalled any other neighbors besides Lou showing up. (3RT 227, 245.)

According to Lou, while Fernandez was trying to resuscitate Ceja, Petitioner walked up beside him and began picking up spent shells. (3RT 191, 211, 212.) Petitioner left shortly thereafter. (3RT 212.) Lou told a detective he had not seen Petitioner after the bodies were found. (4RT 379.)

After Fernandez finished trying to resuscitate Ceja, he gave Lou a chrome, gray, or silver handgun with a magazine in it to hold for him that he retrieved from his car. Someone had been killed there and Fernandez did not want the gun in his car if it was searched. (3RT 162, 195-196, 228, 229, 231, 239-241, 248, 4RT 369.) Lou put the gun in a plastic tub/container in his front yard or porch. (2RT 163, 197, 201.)

Jeff owed Lou $4,000 for bailing him out of jail and Jeff was not making the payments. (3RT 199.) Lou was upset about it and the bail bondsman was harassing Lou when Jeff did not pay. (3RT 199, 214.) Two days before the shootings, Lou yelled at Jeff about the money. (3RT 200-201.) Lou told a detective he had $4,000 on his mind. (3RT 200.) When Lou bailed Jeff out, he knew there was a risk Jeff would not be able to pay. (3RT 200, 214.)

Lou had video surveillance cameras at his house that day showing different areas. (3RT 148-150, 155.) At certain points Claro, Lou, Fernandez, Zavala, and Petitioner are shown in the video on or near Lou's property or next door at Jeff's. (3RT 150, 156, 157, 164-165, 167.) Petitioner is shown coming into Lou's yard that evening. (3RT 156, 157, 158, 161.)

The surveillance video of Lou's house shows what appears to be a black or dark gun in Lou's hand as he returned to his house, not a chrome or silver gun as Fernandez described. (3RT 161-162, 241- 242, 4RT 368, 387-388.) Lou denied going to Jeff's house with a gun. (3RT 162.) He also denied shooting Jeff or Ceja. (3RT 163.)

Fernandez had seen Petitioner fire a gun in Petitioner's yard during a barbecue. (3RT 246.) Fernandez told police it was Lou's gun. (3RT 246.) Fernandez also told police that he saw Petitioner go up to a vehicle that Jeff was in a few days before Jeff's death, pull out a gun and say, "Tell me why I shouldn't shoot you right now." Jeff responded he would get Petitioner his money. (3RT 250-251, 4RT 345.)

When police arrived, Ceja had a weak pulse but was rapidly failing. (2RT 98.) Jeff was lying in the front porch area of his house by the front door some 30 feet from where Ceja was lying after Fernandez moved him from underneath the truck. (2RT 81-83, 97- 98.) Five spent .9-millimeter shell casings and three live rounds were found near the bodies. (2RT 76, 105, 4RT 350-352.) One was under Jeff. (2RT 123.) The shell casings were from a .9-millimeter Glock handgun, the type of gun used on Jeff and Ceja. (4RT 350, 368, 385.) Beer cans were also in the area. (2RT 105.)

Lou admitted he owned a Glock 9-millimeter gun but told police it had been stolen from his car and he never reported the theft. (3RT 202.) He later told police he had given it to Petitioner. (4RT 392-393.)

Jeff died from multiple gunshot wounds, two of which damaged the heart and aorta causing massive hemorrhaging. (3RT 258-260.) Ceja also died from multiple gunshot wounds, one of which pierced the vena cava, the largest vein in the body. Another bullet caused massive damage to Ceja's heart. (3RT 263, 264, 270.)

### Petitioner's statements

When first interviewed by Detective Scott at his home on September 7, 2016, Petitioner said he was in Bakersfield the evening of September 4th but was not allowed to go to his home when he returned because the area had been cordoned off by police. (4RT 355.) When asked if he had been to Lou's house that evening, he denied it. (4RT 356.) When asked about his relationship with Jeff, he said he had done some repair work for Jeff, a partial payment had been made, but Jeff had not finished paying him off. (4RT 356-357.) Petitioner said he was struggling, eating spoiled food or food from the garbage can while Jeff was living rent free. (4RT 357.)

Petitioner was later arrested and taken to the Delano Police Department where an interrogation by Detective Scott was videotaped on September 7, 2016. (4RT 357, 1CT 179-219.) During the interrogation, he denied he was present at Jeff's house the evening of the murder. (1CT 187.) He discussed his whereabouts and activities during the day and evening. (1CT 179—192, 206, 208-211.) He admitted going over to Lou's at some point, indicating he knocked on the door before he left to go to Bakersfield, but Lou did not answer, and Petitioner was uncertain as to the exact time because he had been drinking. (1CT 187-188, 191-192, 210-211.) He insisted he knocked on Lou's door, even though Scott informed him that the video did not show him knocking of the door. (1CT 192.) He denied seeing Chavez that Sunday but acknowledged seeing Jesus and Claro. (1CT 189-190.)

He was not home that night, so he did not hear any gunshots. (1CT 192-193.) He later acknowledged hearing four or five gunshots from inside his house and then going to Bakersfield. (1CT 194-195, 208.)

Jeff did not pay Petitioner the full amount of money he owed him for building a wall for him when Petitioner was struggling. Jeff said he would pay him. (1CT 196-197.) Jeff owed him $2,500 but had only paid him $400. (1CT 198.) When Petitioner would ask him for his money, Jeff would say he would see what he could do, would pay him some money, but never tried to give him the whole amount. (1RT 199, 213-215.) Consequently, Petitioner was not interested in helping Jeff after he heard the shots. (1CT 195-197.) Jeff was living there rent free without any worries and did not care about paying Petitioner. (1CT 199.) He had not talked about the money with Jeff that Sunday or for many months. (1CT 199.)

He denied shooting Jeff. (1CT 202, 216, 218.) He denied having a gun for protection and that someone had given him a gun to hold for his protection but stated he had one before. (1CT 201.) He denied talking to Jeff or that Jeff came to his house that day. (1CT 203, 204.)

Petitioner cared a great deal about the welfare of his grandfather for whom he was a caretaker. (1CT 184-185, 197, 199, 212-213.)

Following the interrogation, Detective Scott took Petitioner to the area where he was to be processed/booked to collect biographical information. (4RT 361.) During the process Petitioner asked if he could speak with his grandfather. (4RT 363.) Scott told him no. (4CT 363.) Petitioner then said, "I'll tell you what happened Sunday if you let me talk to my grandfather." (4RT 363.) Scott told him, "Tell me what you're gonna tell me. Tell me what happened on Sunday." (4RT 363.)

Another officer who was present then video recorded the subsequent conversation with a cellphone. (4RT 363.) Petitioner told Scott he shot both subjects. He did so out of rage from having seen Jeff living better than him. He denied doing it because he was struggling and because Jeff did not pay him, stating he did it "just for the fuck of it." "[H]e was always buying shit, you know what I mean, uhm, eat out every day….how would you feel? Eating all fucking rotten food, you know what I mean?" Petitioner stated he had the gun at his house before he shot him and had later melted it down at a chop shop in Delano or Bakersfield. When asked why he shot the other person, Ceja, Petitioner replied, "Fucking witness." (1CT 220-222.)

### B. Defense

Officer Mendoza was dispatched to the crime scene at 8:40 p.m. and spoke with Lou, apparently at his house. (4RT 395-396.) Lou stated he had left his residence about 8:00 p.m. and denied walking onto Jeff's property. (4RT 396.) He said he did not hear any gunshots. (4RT 397.) He said when he returned home the only person in his house was his mother. (4RT 397.) He told the officer the camera affixed to the front of his house worked but did not record. (4RT 397.) He said nothing about not knowing how to use the camera. (4RT 397.)

### C.   Claims for Relief

### I.   Claim One

23.   Paragraphs 1 through 22 are hereby incorporated by reference.

24.   Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments due to the retroactive application of P.C. § 859.5.

25.   Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

26.   The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim One is hereby incorporated by reference.

### II.   Claim Two

27.   Paragraphs 1 through 26 are hereby incorporated by reference.

28.   Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments due to the trial court's erroneous admission of Petitioner's involuntary confession.

29. Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

30. The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Two is hereby incorporated by reference.

### III. Claim Three

31. Paragraphs 1 through 31 are hereby incorporated by reference.

32. Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments due to the trial court's erroneous voluntary intoxication jury instruction.

33. Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

34. The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Three is hereby incorporated by reference.

### IV. Claim Four

35. Paragraphs 1 through 34 are hereby incorporated by reference.

36. Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the trial court erroneously instructed the jury on flight.

37. Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

38. The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Four is hereby incorporated by reference.

### V. Claim Five

39. Paragraphs 1 through 38 are hereby incorporated by reference.

40. Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments due to ineffectiveness of trial counsel.

41. Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

42. The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Five is hereby incorporated by reference.

### VI. Claim Six

43. Paragraphs 1 through 42 are hereby incorporated by reference.

44. Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where he is legally, factually, and actually innocent of the offenses of which he was charged, convicted, and sentenced.

45. Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

46. The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Six is hereby incorporated by reference.

### D. Prayer for Relief

WHEREFORE, Petitioner respectfully requests that this Honorable Court:

1. Take judicial notice of the transcripts, records, and files in Carlos Razo Cervantes: Kern County, case numbers BF165489A and HC017164A; California Court of Appeal, Fifth District, case numbers F077943 and F084925; and California Supreme Court case numbers S265607 and S279974.

2. Order Respondent and the People of California to file and serve a certified copy of the record on appeal and show cause why Petitioner is not entitled to the relief sought;

3. Grant a hearing to enable Petitioner to satisfy his remaining burden of proof, namely that the error had a substantial and injurious effect or influence in determining the jury's verdict;

4. Find that the state court unreasonably determined the facts and unreasonably applied clearly established Federal law;

5. Grant this First Amended Petition for Writ of Habeas Corpus; and

6. Grant Petitioner any additional, appropriate relief as ordered by this Honorable Court.

| | |
|---|---|
| Dated: August 28, 2023 | Respectfully submitted, |
| | SPOLIN & DUKES P.C. |
| | By: /s/ Aaron Spolin |
| | Attorney for the Petitioner |

**VERIFICATION**

I, Aaron Spolin, hereby declare as follows:

I am an attorney admitted to practice law in the State of California. I represent Petitioner herein, who is confined and restrained of his liberty at the California Correctional Institution, in Kern County. I have read the foregoing First Amended Petition for Writ of Habeas Corpus and am informed and believe the allegations therein are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on August 28, 2023, at Los Angeles, California.

/s/ Aaron Spolin
Aaron Spolin

# CERTIFICATE OF SERVICE

Case Name: Carlos Razo Cervantes on Habeas Corpus

I hereby certify that on September 7, 2023, I electronically filed the following document with the Clerk of the Court using the CM/ECF system:

**Verified First Amended Petition for Writ of Habeas Corpus; Memorandum of Points and Authorities**

I also served Petitioner's **Verified First Amended Petition for Writ of Habeas Corpus; Memorandum of Points and Authorities**, by causing to be placed a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail, addressed as follows:

LEGAL MAIL
Carlos Razo Cervantes, CDCR No. BH1279
California Correctional Institution
Housing: A1 C2-202
P.O. Box 1902
Tehachapi, CA 93581
**Via US Mail**

I declare under penalty of perjury that the foregoing is true and correct, and this declaration was executed at Los Angeles, California, on September 7, 2023.

/s/ Aaron Spolin
_____
Aaron Spolin