1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CARLOS CERVANTES,                   No.  1:22-cv-00175-KES-SKO (HC)

12              Petitioner,              **FINDINGS AND RECOMMENDATION
                                         TO DENY PETITION FOR WRIT OF**
13        v.                             **HABEAS CORPUS**

14   TAMMY CAMPBELL, Acting Warden,      **[THIRTY-DAY OBJECTION DEADLINE]**

15              Respondent.

16

17        Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant

18   to 28 U.S.C. § 2254. He is represented in this action by Aaron Spolin, Esq. This matter was

19   referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302. As

20   discussed below, the Court finds the petition to be without merit and recommends it be **DENIED.**

21   **I.       PROCEDURAL HISTORY**

22        On July 10, 2018, a Kern County jury found Petitioner guilty of two counts of first degree

23   murder (Cal. Penal Code § 187(A)).  (Doc. 40-2 at 16.)  As to both counts, the jury found true a

24   multiple murder special circumstance (Cal. Penal Code § 190.2(a)(3)), found that Petitioner

25   personally and intentionally discharged a firearm causing great bodily injury or death (Cal. Penal

26   Code § 12022.53(d)), and found that Petitioner personally and intentionally discharged a firearm

27   during the commission of the murders (Cal. Penal Code § 12022.53(c)). (Doc. 40-2 at 16.)  On

28   August 9, 2018, Petitioner was sentenced to two consecutive terms of life without the possibility

of parole, plus a consecutive term of 50 years to life.  (Doc. 40-2 at 16.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  (Doc. 40-12.)  On October 14, 2020, the Fifth DCA affirmed the judgment.  People v. Cervantes, 55 Cal.App.5th 927 (2020).  Petitioner petitioned for review in the California Supreme Court. (Doc. 40-16.)  On January 31, 2021, the California Supreme Court summarily denied review. (Doc. 40-17.)

Petitioner filed a petition for writ of habeas corpus in the Kern County Superior Court on January 18, 2022. (Doc. 40-18.)  On March 2, 2022, the superior court denied the petition in a reasoned decision. (Doc. 40-19 at 1-12.)  On May 15, 2023, Petitioner filed a habeas petition in the California Supreme Court, which was summarily denied. (Doc. 40-20, 21.)

On February 11, 2022, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.)  On September 2, 2022, the case was held in abeyance pending exhaustion of state remedies as to Grounds Five and Six. (Doc. 9.)  Following exhaustion of state remedies, Petitioner filed a First Amended Petition on September 7, 2023. (Doc. 21.)  On March 26, 2024, the District Court dismissed Ground Five (except for a sub-claim asserting ineffective assistance of counsel) and Ground Six from the First Amended Petition. (Doc. 36.)  Respondent filed an answer on May 3, 2024. (Doc. 41.)  On July 15, 2024, Petitioner filed a traverse. (Doc. 44.)

## II.    FACTUAL BACKGROUND[1]

In the evening hours of September 4, 2016, Villegas and Ceja were fatally shot in the front yard of Villegas's home in Delano. Villegas's body was found near the front door, and Ceja's body was found in the yard next to a tractor trailer. Both men died of multiple gunshot wounds and were pronounced dead at the scene. Villegas was shot twice in the chest, resulting in massive hemorrhaging from his heart, aorta, and other organs. He also was shot through his right forearm. Ceja was shot once in the arm and once in the back. Both projectiles entered his chest and caused massive damage to multiple vital organs. One projectile was recovered from each of the men's

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts in Cervantes, 55 Cal.App.5th at 932-36.  See Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

bodies. Law enforcement determined the men were shot with a Glock firearm.

Petitioner lived in the house immediately to the west of Villegas. Lounito V. lived in the house immediately to the east. Jose F. and Anna Z. lived with Villegas. As set forth below, these individuals and others provided testimony regarding the night of the incident.

A.    Events Leading up to the Shooting

On the evening of September 4, 2016, Petitioner, Lounito, Roland C., Roberto C., and Jesus H. were standing in front of Petitioner's house, talking.  Petitioner was drinking. After approximately 10 minutes, Roland left the conversation and walked to Lounito's house to use the WiFi.

Eventually, Ceja arrived at Villegas's house and waited outside. Lounito and the others began to leave Petitioner's front yard, and around the same time, Villegas pulled up to his own house. Petitioner became agitated and angry, and said, "I'm gonna get him." Villegas walked toward his own front door. Lounito and Roberto walked toward Lounito's house, with Roberto in the lead. Jesus walked off in the same direction as Lounito and Roberto.

B.    The Shooting

Roberto testified that he was walking toward Lounito's house when he turned around and saw Petitioner walking toward Villegas's house with something in his hand and he heard a clicking sound. He acknowledged he previously told police that he saw Petitioner enter Villegas's property with a gun and heard him rack the gun. Roberto heard two shots, then heard Villegas screaming, "I didn't say anything, Carlos," followed by four more shots. Shortly thereafter, he saw Petitioner leaving Villegas's property in the direction of Petitioner's house. After the shooting, Roberto left. Roberto eventually spoke with Roland, learned that Lounito had been taken in for questioning, and he then spoke to police.

Lounito testified that he had taken a few steps into his driveway when he heard Villegas yell, "I didn't say anything. I didn't say anything," followed seconds later by several gunshots. Lounito continued toward the front of his house and waited a couple of minutes. When nothing further happened, Lounito went to his truck, which was parked in front of Villegas's house, and drove it around the block and back to his own driveway. When he returned, Roberto was gone.

1     Lounito went inside his house with Roland, who had remained in Lounito's yard.

2         Roland testified that he was sitting at a patio table in Lounito's front yard when Roberto

3     entered the yard. Roland heard two shots from somewhere very close, followed by Villegas

4     screaming, "No. No, I wasn't talking shit." Roland then heard two more shots, followed by four

5     shots in a row. Roland saw Petitioner leave Villegas's residence and walk back toward

6     Petitioner's house. Roberto left immediately. Roland began packing his belongings. Lounito

7     stated that he needed to get his truck, and also to return Petitioner's dog, which had gotten loose.

8     Roland waited for Lounito to return, and they then went inside the house. Roland went into the

9     restroom and opened the window to listen for sounds from Villegas, but heard nothing. After

10    Roland left the restroom, Petitioner called Lounito twice. Lounito answered the second call and

11    said, "Okay. I'll be right there." Roland prevented Lounito from going outside. Roland and

12    Lounito looked at Lounito's surveillance cameras and did not see anyone outside the house. They

13    then heard Jose outside calling for help. Lounito went outside and looked around, then returned

14    and told Roland not to touch anything. Roland went home.

15        Jose and Anna testified that they arrived at Villegas's house, where they were living rent

16    free, as it was getting dark, and they sat in the car for approximately five minutes. When Anna got

17    out of the car, she saw Ceja on the ground underneath a tractor trailer. She thought he was asleep

18    and told Jose, who pulled Ceja from under the vehicle and realized he was not breathing. Jose

19    began giving Ceja CPR. They also saw Villegas on the ground near the front door. Anna called

20    911. They called out to the neighbors and Lounito came out. Jose took an inoperable gun from his

21    car and asked Lounito to hold it because he did not want anyone thinking it was used in the

22    murders. Jose and Anna were locked out of the house and did not have a place to stay. Lounito

23    paid for them to get a motel room.

24        Lounito confirmed that, at some point "a long time" after the gunshots, he stepped back

25    outside to see what was happening and heard Villegas's roommates, Jose and Anna, calling him

26    frantically. Lounito went to Villegas's yard and saw Villegas on the ground near the front door

27    and Jose trying to resuscitate Ceja. During this period, Petitioner briefly came into the yard and

28    began picking up spent shells; he did not say anything. Jose gave Lounito a gun and Lounito put

1  the gun in a tub in his front yard. He then waited with Jose and Anna for the police to arrive.

2          C.     The Investigation

3        Police officers from the Delano Police Department arrived at Villegas's residence at

4  approximately 8:30 p.m. They found Ceja next to the tractor trailer and Villegas next to the front

5  door. Villegas had no pulse and Ceja had a weak pulse. They did not locate any weapons near

6  either victim. Shell casings and live rounds were found near the victims. The casings were

7  determined to be nine-millimeter casings from a Glock handgun, the same kind used to shoot

8  Villegas and Ceja.

9        Officers searched Jose for weapons but did not find any. Jose denied any knowledge of

10  who committed the shooting. He told police he had once seen Petitioner fire a gun during a

11  barbecue. Jose thought the gun belonged to Lounito. He also told police that, a few days before

12  the incident, he saw Petitioner approach a vehicle Villegas was in, pull out a gun, and state, "Tell

13  me why I shouldn't shoot you right now." Villegas responded that he would get Petitioner's

14  money.

15        Officers seized surveillance video from Lounito's residence for the night of the incident.

16  Early the following morning, officers determined that the video showed someone on Lounito's

17  property holding a firearm, and they suspected Lounito was that individual. Lounito was taken

18  into custody. The video also showed Petitioner coming into Lounito's front yard on the evening

19  of the incident.

20        While in custody, Lounito told a detective that he was not home at the time of the

21  shooting and did not hear any gunshots. When confronted with evidence indicating he was at

22  home, Lounito claimed he could not have heard gunshots over the sound of his television, fan,

23  and air conditioner. At trial, Lounito testified that he lied to police because he believed his life

24  was in danger.

25        Lounito owned several guns. He also had a magazine for a nine-millimeter Glock firearm

26  and a nine-millimeter rounds. He told police the Glock had been stolen from his car and never

27  reported. He later told police he gave the gun to Petitioner.

28        According to Lounito, Villegas owed Lounito $4,000 for bailing him out of jail, and

1     Villegas was not making payments. Two days before the shooting, Lounito told Villegas he

2     needed to pay because the bail bondsman was calling about the money. Lounito told officers

3     about this debt and acknowledged that he was upset about it.

4           D.      Petitioner's Statements

5           Petitioner was interviewed at his home on September 7, 2016, three days after the

6     incident, by Delano Police Detective Scott. Petitioner told Scott that he was in Bakersfield on the

7     night of the incident and could not return to his home that evening because the area was cordoned

8     off by police. He denied going to either Villegas's or Lounito's house that evening. He stated he

9     had done repair work for Villegas and had received only a partial payment. Petitioner told Scott

10    he was struggling and eating food from the garbage while Villegas was living rent free.

11          Following this conversation, Scott arrested Petitioner and transported him to the police

12    department where Scott interviewed him again. A video recording of the interview was played for

13    the jury. In the interview, Petitioner stated that he went to Bakersfield at approximately 7:00 p.m.

14    He stopped at a gas station and then received a call from his aunt telling him something had

15    happened on his street. He drove back home, but his street was blocked off, and he was not able

16    to return. He slept at his aunt's house that night and returned home the next morning by going

17    through an alley and jumping over the fence.

18          Petitioner denied going to Villegas's house that night and denied shooting him. He

19    admitted he went to Lounito's house before going to Bakersfield. He claimed he knocked on the

20    door, but no one answered, and he went home. Approximately five minutes later, Lounito called

21    Petitioner and told him his dog had gotten loose, and that Lounito would put the dog back in

22    Petitioner's yard.

23          Petitioner initially stated he did not hear any gunshots that night because he was not home.

24    He later acknowledged he heard four or five gunshots before he left for Bakersfield. When he left

25    his house, he saw Jose and his girlfriend yelling for help, and saw a body.

26          Petitioner stated that Villegas owed him $2,500 for building a wall for him, but had only

27    paid him $400. Villegas made payments, but could never pay the full amount. According to

28    Petitioner, Villegas was living rent free and did not care about paying Petitioner. Petitioner had

1   not talked to Villegas about the money for several months. Petitioner mentioned several times that

2   he was the caretaker for his grandfather and was concerned because his grandfather was home

3   and Petitioner did not like leaving him alone.

4       After the interview, Scott took Petitioner to a processing area outside the interview room.

5   While being booked, Petitioner suggested he would tell Scott what happened if Scott permitted

6   him to talk to his grandfather. Petitioner then admitted he shot Villegas out of rage because

7   Villegas was living better than him. He shot Ceja because Ceja was a witness. He drove to a

8   "chop shop" in Bakersfield that same night to "melt[ ] down" the gun.

9       E.    <u>Defense Evidence</u>

10       Delano Police Officer Mendoza testified that he spoke with Lounito on the night of the

11   shooting. Lounito reported that he left his house around 8:00 p.m., and that he did not hear any

12   gunshots or walk onto Villegas's property. Mendoza noticed a camera affixed to the front of

13   Lounito's house and asked whether it was working and recording. Lounito responded that the

14   camera did work but did not record.

15   **III.    DISCUSSION**

16       A.    <u>Jurisdiction</u>

17       Relief by way of a petition for writ of habeas corpus extends to a person in custody

18   pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

19   treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>,

20   529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

21   guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern

22   County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

23   2254(a); 28 U.S.C.§ 2241(d).

24       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

25   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

26   enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

27   filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

28   and is therefore governed by its provisions.

7

1          B.       Legal Standard of Review

2          A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

3   the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

4   that was contrary to, or involved an unreasonable application of, clearly established Federal law,

5   as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

6   based on an unreasonable determination of the facts in light of the evidence presented in the State

7   court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

8   Williams, 529 U.S. at 412-413.

9          Under Section 2254(d)(1), a state court decision is "contrary to" clearly established

10  federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme

11  Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a

12  [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141

13  (2005) (citing Williams, 529 U.S. at 405-406.  This court looks to "Supreme Court holdings at

14  the time of the state court's last reasoned decision" as "the source of clearly established Federal

15  law for the purposes of AEDPA." Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005). A

16  Supreme Court precedent is not clearly established law under section 2254(d)(1) unless the Court

17  "squarely addresses the issue" in the case before the state court. Wright v. Van Patten, 552 U.S.

18  120, 125–26 (2008) (per curiam) (concluding that a state court had not unreasonably applied

19  federal law to a claim of prejudice under Strickland where the logic of petitioner's argument

20  would have required the extension of the Supreme Court's inherent prejudice doctrine to a new

21  context); Carey v. Musladin, 549 U.S. 70, 76–77 (2006) (same). While "[c]ertain principles are

22  fundamental enough that when new factual permutations arise, the necessity to apply the earlier

23  rule will be beyond doubt," Yarborough v. Alvarado, 541 U.S. 652, 666 (2004), "when a state

24  court may draw a principled distinction between the case before it and Supreme Court caselaw,

25  the law is not clearly established for the state-court case." Murdoch v. Castro, 609 F.3d 983, 991

26  (9th Cir. 2010). "'[I]f a habeas court must extend a rationale before it can apply to the facts at

27  hand,' then by definition the rationale was not 'clearly established at the time of the state court

28  decision.'" White v. Woodall, 572 U.S. 415, 426 (2014) (quoting Yarborough, 541 U.S. at 666).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  Cullen v. Pinholster, 563 U.S. 170, 203 (2011).  The petitioner "must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'"  Shinn v. Kayer, 592 U.S. 111, 118 (2020) (quoting Virginia v. LeBlanc, 582 U. S. 91, 93 (2017) (*per curiam*)).  Rather, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility of fairminded disagreement*."  Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 592 U.S. at 118.  In other words, so long as fairminded jurists could disagree with each other as to whether the state court was correct, the state court decision is not unreasonable under AEDPA.  Congress "meant" this standard to be "difficult to meet."  Richter, 562 U.S. at 102.

Section 2254(d)(2) pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  The federal habeas court must give "substantial deference" to the state court.  Brumfield v. Cain, 576 U.S. 305, 314 (2015). "Factual determinations by state courts are presumed correct" and the petitioner bears the burden of overcoming the presumption with "clear and convincing evidence to the contrary."  Miller-El, 537 U.S. at 340; 28 U.S.C. § 2254(e)(1). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).  If "'[r]easonable minds reviewing the record might

1  disagree' about the finding in question, '. . . that does not suffice'" to prove the lower court's

2  factual determination was unreasonable. Wood v. Allen, 558 U.S. 290, 301 (2010) (alteration in

3  original) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)).

4      To determine whether habeas relief is available under § 2254(d), the federal court looks to

5  the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

6  Nunnemaker, 501 U.S. 979, 803 (1991); Andrews v. Davis, 994 F.3d 1042, 1107 (9th Cir. 2019)

7  (en banc).  "[A]lthough we independently review the record, we still defer to the state court's

8  ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

9      The prejudicial impact of any constitutional error is assessed by asking whether the error

10  had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

11  Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

12  (holding that the Brecht standard applies whether or not the state court recognized the error and

13  reviewed it for harmlessness).

14      C.      Review of Petition

15      Petitioner presents five grounds for relief in his First Amended Petition.[2]  He claims he

16  was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth

17  Amendments due to: 1) the trial court's failure to retroactively apply Cal. Penal Code § 859.5; 2)

18  the trial court's erroneous admission of Petitioner's involuntary confession; 3) the trial court's

19  jury instruction on involuntary intoxication; 4) the trial court's erroneous instruction on flight;

20  and 5) the ineffective assistance of counsel in failing to present evidence that Petitioner's

21  confession was coerced.

22      1.      Claim One

23      In his first claim, Petitioner alleges his due process rights were violated when the trial

24  court erroneously failed to retroactively apply Cal. Penal Code § 859.5.  He contends that his

25  confession would have been excluded at trial had the trial court applied the statute, because the

26  confession was not recorded according to the new law.  Petitioner raised this claim on direct

27

28  _____

[2] As previously noted, Ground Six and part of Ground Five were dismissed.

appeal.  In the last reasoned decision, the Fifth DCA denied the claim as follows:

*I. Section 859.5*

Section 859.5, which requires the electronic recording of certain custodial statements, was amended after defendant confessed to the shootings. Defendant contends the amendments should apply retroactively to his confession. He further contends the amendments would render his confession inadmissible, and reversal is therefore required. To the extent these arguments are forfeited, he claims ineffective assistance of counsel. The People contend defendant's arguments are forfeited and also lack merit and, regardless, reversal is not the appropriate remedy.

We exercise our discretion and consider defendant's contention on the merits. As a result, we need not address defendant's ineffective assistance of counsel claim. (See *People v. Hardy* (1992) 2 Cal.4th 86, 209, 5 Cal.Rptr.2d 796, 825 P.2d 781.) We conclude the 2017 amendments to section 859.5 do not operate retroactively. Accordingly, we find no reversible error.

*A. Additional Background*

Defendant confessed to the shootings on September 7, 2016. At that time, section 859.5 required that the custodial interrogation of *a minor* suspected of committing murder be recorded in its entirety. (Former § 859.5.) However, this requirement did not apply to defendant, who was an adult. Defendant's confession was recorded on a cell phone in four separate clips, rather than in an uninterrupted recording. The booking conversation that precipitated the confession was not recorded.

Effective January 1, 2017, section 859.5 was amended to require, with limited exceptions, that the custodial interrogations of *all* persons suspected of committing murder, whether adult or minor, be recorded in their entirety. (§ 859.5, subds. (a), (b), (d); Stats. 2016, ch. 791, § 2.) If the recording requirement is not met, and the interrogation is not subject to one of several enumerated exceptions, the court may consider law enforcement's noncompliance in adjudicating any motions to suppress the statements and in determining whether the statement was involuntary or unreliable, and shall instruct the jury to view with caution the statements made in that custodial interrogation. (§ 859.5, subd. (e).)

On June 28, 2018, defense counsel filed her motions in limine, including her motion seeking to suppress defendant's confession on the ground it was the product of improper promises and therefore involuntary. Therein, defense counsel noted that section 859.5 had recently been amended to require "electronic recording of the entire custodial interrogation of any person suspected of committing murder." Counsel argued that "[t]he failure to record the statement taken at processing in its entirety ... makes the accuracy and meaning of the statement subject to question." Counsel did not specifically argue that the amendments to section 859.5 applied retroactively, or that the confession should, accordingly, be suppressed.

*B. Law Regarding Retroactivity*

"Whether a statute operates prospectively or retroactively is, at least in the first instance, a matter of legislative intent." (*People v. Brown* (2012) 54 Cal.4th 314, 319, 142 Cal.Rptr.3d 824, 278 P.3d 1182 (*Brown*).) In determining legislative intent, """[w]e begin by examining the statute's words, giving them a plain and

11

commonsense meaning.""" (*People v. Scott* (2014) 58 Cal.4th 1415, 1421, 171 Cal.Rptr.3d 638, 324 P.3d 827; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 879-880, 236 Cal.Rptr.3d 84, 422 P.3d 531 (*Buycks*).) "But the statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme." (*Buycks*, at p. 880, 236 Cal.Rptr.3d, 422 P.3d 531; accord, *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141, 218 Cal.Rptr.3d 150, 394 P.3d 1074.) "'[W]e consider the language of the entire scheme and related statutes, harmonizing the terms when possible.'" (*Gonzalez*, at p. 1141, 218 Cal.Rptr.3d 150, 394 P.3d 1074.) We presume the Legislature, in enacting a statute, "was aware of existing related laws and intended to maintain a consistent body of rules." (*People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 199, 96 Cal.Rptr.2d 463, 999 P.2d 686.)

"No part of the Penal Code 'is retroactive, unless expressly so declared.' (§ 3.) '[T]he language of section 3 erects a strong presumption of prospective operation, codifying the principle that, "in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the [lawmakers] ... must have intended a retroactive application." [Citations.] Accordingly, "'a statute that is ambiguous with respect to retroactive application is construed ... to be unambiguously prospective.""" (*Buycks, supra*, 5 Cal.5th at p. 880, 236 Cal.Rptr.3d 84, 422 P.3d 531.)

Despite the foregoing, a "limited rule of retroactivity" applies to newly enacted criminal statutes that are intended to ameliorate criminal punishment. (*Buycks, supra*, 5 Cal.5th at p. 881, 236 Cal.Rptr.3d 84, 422 P.3d 531 [discussing *In re Estrada* (1965) 63 Cal.2d 740, 48 Cal.Rptr. 172, 408 P.2d 948 (*Estrada*)].) "The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.'" (*Buycks*, at p. 881, 236 Cal.Rptr.3d 84, 422 P.3d 531.)

### C. Analysis

Defendant concedes "[s]ection 859.5 does not expressly state that its provisions apply retroactively" and that the legislative history of section 859.5 does not clearly indicate the Legislature intended for the amendments to have retroactive application. Defendant further concedes the amendments to section 859.5 do not reduce punishment for a class of crimes. Nonetheless, he contends *Estrada, supra*, 63 Cal.2d 740, 48 Cal.Rptr. 172, 408 P.2d 948 applies because the amendments to section 859.5 provide a clear and significant benefit to defendants.

Our Supreme Court articulated the reasoning behind the *Estrada* rule as follows:

> "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to

12

conclude that the Legislature was motivated by a desire for vengeance, a
conclusion not permitted in view of modern theories of penology."
(*Estrada, supra*, 63 Cal.2d at p. 745, 48 Cal.Rptr. 172, 408 P.2d 948.)

Recently, our Supreme Court revisited the *Estrada* rule. In *People v. Superior
Court (Lara)* (2018) 4 Cal.5th 299, 303, 228 Cal.Rptr.3d 394, 410 P.3d 22 (*Lara*),
our high court concluded a prohibition in Proposition 57 (the Public Safety and
Rehabilitation Act of 2016) against direct charging of juveniles in adult court
applied retroactively. The court noted that *Estrada* was not "directly on point"
because Proposition 57 reduced punishment for a class of persons, rather than for a
crime. (*Lara, supra*, at pp. 303-304, 228 Cal.Rptr.3d 394, 410 P.3d 22.)
Nonetheless, the court concluded, the electorate's apparent determination that the
former system of direct filing was too severe created an inference that the
ameliorative benefits of Proposition 57 were intended to extend as broadly as
possible. (*Lara, supra*, at pp. 309-310, 228 Cal.Rptr.3d 394, 410 P.3d 22 [adopting
the reasoning of *People v. Vela* (2017) 11 Cal.App.5th 68, 80, 218 Cal.Rptr.3d 1, 3
(judg. *vacated and cause remanded, reaffd*. (2018) 21 Cal.App.5th 1099, 230
Cal.Rptr.3d 880)].) Similarly, in *People v. Frahs* (2020) 9 Cal.5th 618, 624-625,
264 Cal.Rptr.3d 292, 466 P.3d 844, our high court concluded that a statute that
created a pretrial diversion program for certain offenders with mental health
disorders applied retroactively. Like in *Lara*, the statute could result "'in
dramatically different and more lenient treatment'" for a class of offenders, and
contained no express savings clause limiting the program to prospective-only
application. (*Id*. at p. 631, 264 Cal.Rptr.3d 292, 466 P.3d 844.)

However, our high court has declined to extend the reach of *Estrada* to legislative
action that does not alter or reduce criminal punishment or treatment for past
criminal conduct. For example, in *Brown*, *supra*, 54 Cal.4th at pages 317–318, 142
Cal.Rptr.3d 824, 278 P.3d 1182, the court rejected the applicability of *Estrada* to a
statute that increased the rate at which local prisoners could earn conduct credits.
The court explained:

"The holding in *Estrada* was founded on the premise that "'[a] legislative
mitigation of the penalty for a particular crime represents a legislative
judgment that the lesser penalty or the different treatment is sufficient to
meet the legitimate ends of the criminal law'" [citation] and the corollary
inference that the Legislature intended the lesser penalty to apply to crimes
already committed. In contrast, a statute increasing the rate at which
prisoners may earn credits for good behavior does not represent a judgment
about the needs of the criminal law with respect to a particular criminal
offense, and thus does not support an analogous inference of retroactive
intent. [The statute at issue] does not alter the penalty for any crime; a
prisoner who earns no conduct credits serves the full sentence originally
imposed. Instead of addressing punishment for past criminal conduct, the
statute addresses future conduct in a custodial setting by providing
increased incentives for good behavior." (*Brown*, at p. 325, 142
Cal.Rptr.3d 824, 278 P.3d 1182, fn. & italics omitted.)

Ultimately, the applicability of the *Estrada* rule to a particular legislative change
depends on whether the statute at issue is "'analogous' to the *Estrada* situation"
and whether the logic of *Estrada* applies. (*Lara, supra*, 4 Cal.5th at pp. 311-312,
228 Cal.Rptr.3d 394, 410 P.3d 22.)

The 2017 amendments to section 859.5 are not analogous to the statute at issue in
*Estrada*. To the contrary, their effect is to impose requirements on certain

13

interrogations, and to circumscribe the admissibility of those statements if those requirements are not met or excused. [Fn.8] In certain instances, the amendments may result in the suppression of statements that are damaging to the defense. In others, they may result in the introduction of a recorded statement that undermines any attempt to sow doubt regarding the credibility of an officer's account of an interrogation. (Stats. 2016, ch. 791, § 1, subd. (b) ["Properly recorded interrogations ... prevent disputes about how an officer conducted himself or herself or treated a suspect during the course of an interrogation, [and] prevent a defendant from lying about the account of events he or she originally provided to law enforcement ...."].) The amendments do not, however, alter the substantive requirements for conviction, nor affect the available punishments in the event of conviction. They do not alter or reduce criminal punishment or treatment.

> [Fn.8] The People rely on *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 300-301, 279 Cal.Rptr. 592, 807 P.2d 434, to argue the amendments to section 859.5 constitute procedural changes that only apply prospectively. The People misunderstand the holding in *Tapia*. *Tapia* did not hold that procedural changes are subject only to prospective application. Rather, *Tapia* held that statutory changes affecting the conduct of a trial that had not yet taken place did not involve a question of retroactivity. (*Tapia*, at p. 288, 279 Cal.Rptr. 592, 807 P.2d 434.) The amendments to section 859.5 are not mere procedural amendments affecting the conduct of a trial. Rather, the conduct regulated by the statute is the interrogation. When an interrogation predates the amendments, applicability of the amendments necessarily requires us to determine whether the amendments should be given retrospective effect. (*People v. Hayes* (1989) 49 Cal.3d 1260, 1274, 265 Cal.Rptr. 132, 783 P.2d 719 [concluding that amendments to Evid. Code, § 795, which required the exclusion of prehypnotic testimony unless certain statutory procedures were followed at the time of hypnosis, governed conduct that predated the statute, and thus involved a question of retroactive application].)

Nor does the logic of *Estrada* apply here. *Estrada* held that a statutory change that ameliorates punishment is presumed to apply retroactively because it reflects a legislative determination that the former punishment was too severe and that a lighter punishment is adequate. (*Estrada, supra*, 63 Cal.2d at p. 745, 48 Cal.Rptr. 172, 408 P.2d 948.) In amending section 859.5, the Legislature stated: "Properly recorded interrogations provide the best evidence of the communications that occurred during an interrogation, prevent disputes about how an officer conducted himself or herself or treated a suspect during the course of an interrogation, prevent a defendant from lying about the account of events he or she originally provided to law enforcement, and spare judges and jurors the time necessary and the need to assess which account of an interrogation to believe." (Stats. 2016, ch. 791, § 1, subd. (b).) Contrary to defendant's assertion, the amendments were not designed to provide a clear and significant benefit to defendants; they were designed to reduce biased interpretation of, and ensure the accuracy of the evidence of, the communication that occurs in an interrogation.

Under the strong presumption of prospective application set out in section 3, and in the absence of any indication the Legislature intended the amendments to apply retroactively, we construe the 2017 amendments to section 859.5 to apply only prospectively. (§ 3; accord, *Buycks, supra*, 5 Cal.5th at p. 880, 236 Cal.Rptr.3d 84, 422 P.3d 531.)

Cervantes, 55 Cal.App.5th at 936-41.

1

a.      Legal Standard and Analysis

2      It is well-settled that federal habeas relief is not available to state prisoners challenging

3   state law.  Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal

4   habeas corpus relief does not lie for errors of state law); Langford v. Day, 110 F.3d 1380, 1389

5   (9th Cir. 1997) ("alleged errors in the application of state law are not cognizable in federal habeas

6   corpus" proceedings).  In this case, Petitioner claims the state court erred by failing to apply a

7   new statute governing evidentiary procedures retroactively.  However, "[t]he retroactivity of a

8   state change of law is a state question and the federal Constitution has no voice upon the subject."

9   La Rue v. McCarthy, 833 F.2d 140, 142 (9th Cir.1987) (internal quotations and citations omitted).

10      To the extent Petitioner claims a violation of his federal due process rights, he fails to set

11   forth any Supreme Court authority which required the appellate court to apply the statute

12   retroactively.  Petitioner contends that various Supreme Court cases allow for the retroactive

13   application of intervening statutes.  For example, Petitioner cites to, inter alia: United States v.

14   Schooner Peggy, 1 Cranch 103, 107, 2 L.Ed. 49 (1801) (Because a treaty signed on September

15   30, 1800, while the case was pending on appeal, unambiguously provided for the restoration of

16   captured property "not yet definitively condemned," the Court reversed a decree entered on

17   September 23, 1800, condemning a French vessel that had been seized in American waters);

18   Bruner v. United States, 343 U.S. 112, 116-17 (1952) (Supreme Court ordered an action

19   dismissed because the jurisdictional statute under which it had been filed was subsequently

20   repealed); Thorpe v. Housing Authority of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474

21   (1969) (Supreme Court held that an agency circular requiring a local housing authority to give

22   notice of reasons and opportunity to respond before evicting a tenant was applicable to an

23   eviction proceeding commenced before the regulation issued); Bradley v. School Bd. of

24   Richmond, 416 U.S. 696, 711 (1974) (Supreme Court concluded that private parties could rely on

25   § 718 of the Education Amendments of 1972, which was passed while the case was pending, to

26   support their claim for attorney's fees).  None of the cases, however, clearly hold that federal law

27   requires a state court to retroactively apply a new state criminal procedure statute.  There is also

28   no Supreme Court authority which requires a confession be recorded to be admitted into

1  evidence.  The absence of any Supreme Court authority is fatal to the claim.  See Carey v.

2  Musladin, 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (where holdings of the

3  Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that

4  the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); see also Wright v.

5  Van Patten, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question

6  presented ... 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established

7  Federal law.' Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized." (internal

8  quotation marks omitted) (quoting Musladin, 549 U.S. at 77)); Moses v. Payne, 543 F.3d 1090,

9  1098 (9th Cir.2008) ("Where no decision of the Supreme Court 'squarely addresses' an issue, a

10  state court's adjudication of that issue cannot result in a decision contrary to, or an unreasonable

11  application of, Supreme Court precedent, and therefore cannot be a basis for habeas relief. Said

12  otherwise, a state court's decision cannot be contrary to a Supreme Court decision that provides

13  'no categorical answer' to the question before the state court.").  Thus, the claim should be

14  denied.

15               2.  Claim Two

16        Petitioner next contends that his confession should have been excluded because law

17  enforcement violated his right to remain silent under Miranda v. Arizona, 384 U.S. 436 (1966).

18  Petitioner also raised this claim on direct appeal.  The Fifth DCA rendered the last reasoned

19  decision, as follows:

20        Defendant contends the trial court prejudicially erred in admitting evidence of his
       confession. He contends the confession was made involuntarily and, relatedly, that
21        the trial court relied on facts not supported by the record in concluding the
       confession was voluntary. Furthermore, he contends the confession was
22        inadmissible because it occurred after he invoked his privilege against self-
       incrimination. [Fn.9]

23
          [Fn.9] These arguments are contained in sections I. and IV. of defendant's
24          opening brief. Because the issues are related, we consider them together.

25              Additional Factual Background

26        In motions in limine, defendant sought to exclude statements he made to law
       enforcement on the ground they were the product of unlawful inducement and
27        therefore involuntary. The court conducted an Evidence Code section 402 hearing
       regarding defendant's statements. Detective Scott testified at the hearing that he
28        interviewed defendant at his home and later in an interview room at the police

department. The interview at the police department was video recorded. Defendant was advised of his *Miranda* [Fn.10] rights and responded that he understood. The parties stipulated that defendant did not confess to any wrongdoing during the interview in the interview room.

[Fn.10] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Scott testified that, after that interview, he took defendant to another area of the department for processing. It took approximately 30 seconds to move defendant, and Scott spent approximately five minutes thereafter gathering defendant's biographical information and entering it into the computer system. At that point, defendant asked whether he could speak with his grandfather. Scott told him no. Scott testified that the department does not permit family members to come to the department to interact with arrestees. According to Scott, defendant then said that "if [Scott] let [defendant] speak with his grandfather he will tell [Scott] what happened" on the date of the incident. Scott responded by stating something to the effect of, "[W]hat are you gonna tell me?" Defendant then asked again to have his grandfather brought down. Scott said, "Well, tell me what you're gonna tell me before I bring your grandfather down here."

The subsequent conversation between defendant and Scott was recorded by Delano Police Officer Bursiaga in four video clips on a cell phone. Defendant was not taken to an interview room but remained in the processing area. Defendant told Scott that he shot Villegas and Ceja. The entire interview lasted approximately five to six minutes.

After the conversation, Scott continued to process defendant. Eventually, defendant's grandfather was brought to the police department and he and defendant were permitted to talk in an interview room. Subsequently, defendant's grandfather left, and defendant was transported to another facility. Defendant made no further statements regarding the incident.

On cross-examination, Scott acknowledged that defendant had mentioned several times, in the interviews at both his house and at the station, that he was the caretaker for his grandfather. Scott also acknowledged that he did not readvise defendant of his rights prior to the last interview in the processing area.

The court denied defendant's motion as follows:

"[T]he defendant reinitiated the conversation along the lines of 'I'll tell you what happened if you let me talk to my grandfather.' The officer did not say -- as I understand the evidence, did not commit one way or the other. It was, 'Tell me what happened first and then' -- and at that point, the defendant made the statements to him that are incriminating in nature, and the officer then got the grandfather.

"There was none of the conduct by the officer that suggests that he was overbearing or insistent or highly skeptical in challenging the defendant's statements along the way. The interview, from what little bit I saw, the part that the defendant was -- did not admit to anything was --- appeared to be relatively low key, which appeared to be somewhat in the nature of the overall testimony of the detective or investigator Scott.

"And the booking process from the audio clips and the testimony of Detective Scott again continued to be a very low-key approach on this

17

interview. And there's nothing in there that suggests to me that [defendant] was manipulated or induced in such a fashion that would taint the admissions to the investigator regarding his involvement in the killing of the two individuals.

"So I don't find that there's any basis to suppress the statements that were made. There was no incentive that was offered by the officer that would overbear the will of [defendant] to make him make an involuntary statement. The best we have is [defendant] offering a bargain of 'Let me talk to my grandfather and I'll tell you what happened,' and the officer saying, 'Well, you tell me what happened, and then you can talk to your grandfather.' I don't see anywhere in that that it's inadmissible or a statement that overbeared [sic] the will of [defendant] such as to make it in any way less than a statement that was voluntarily given by [defendant]."

*Applicable Law Regarding Confessions*

The law applicable to defendant's challenges is set out by our Supreme Court in *People v. McCurdy* (2014) 59 Cal.4th 1063 (*McCurdy*):

"The applicable law is settled: "'As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' [Citations.]'" [Citation.]

""'[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial' [citation], at least during the prosecution's case-in-chief [citations]." [Citation.] "Critically, however, a suspect can waive these rights." [Citation.]' [Citation.] 'The waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" [citation], and knowing in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." [Citation.]' [Citation.]

"In addition, '[t]he due process clause of the Fourteenth Amendment precludes the admission of any involuntary statement obtained from a criminal suspect through state compulsion.' [Citation.] "'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary "'[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne.'" [Citation.] Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.] "'On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review." ' [Citation.]" [Citation.] "'[W]hen a reviewing court considers a claim that a confession has been improperly coerced, if the evidence conflicts, the

1   version most favorable to the People must be relied upon if supported by
    the record. [Citations.]'" [Citation.]' [Citation.]" (*McCurdy, supra*, 59
2   Cal.4th at pp. 1085-1086, italics omitted.)

3           *The Trial Court's Factual Findings*

4   Defendant contends the trial court erroneously found that he reinitiated the
    conversation with Scott by offering to make a further statement if Scott let him
5   talk to his grandfather. According to defendant, the court neglected to find that it
    was Scott's refusal to let defendant speak with his grandfather that precipitated
6   defendant's offer to make a further statement.

7   We need not resolve this question for purposes of our review. There is no factual
    dispute regarding the contents of Scott's testimony. While we must defer to the
8   trial court's findings regarding conflicts in the evidence and inferences to be drawn
    therefrom when such findings are supported by substantial evidence (*McCurdy,*
9   *supra*, 59 Cal.4th at p. 1086; *People v. Tully* (2012) 54 Cal.4th 952, 979 (*Tully*)),
    Scott's account of the events leading to defendant's confession is not in dispute.
10
    In any event, we find no error. Defendant asked to speak with his grandfather.
11  Scott refused. Defendant then offered to tell Scott what had occurred on the date of
    the incident if he was permitted to speak with his grandfather. Scott asked
12  defendant, "[W]hat are you gonna tell me?" Defendant then asked to have his
    grandfather brought in. Scott told defendant, "Well, tell me what you're gonna tell
13  me before I bring your grandfather down here." Defendant then made his
    statement. The court summarized this testimony as follows: "[T]he defendant
14  reinitiated the conversation along the lines of 'I'll tell you what happened if you let
    me talk to my grandfather.' The officer did not say -- as I understand the evidence,
15  did not commit one way or the other. It was, 'Tell me what happened first and
    then' -- and at that point, the defendant made the statements to him that are
16  incriminating in nature, and the officer then got the grandfather." Although the
    court's summation of the facts omitted some details, particularly that Scott initially
17  refused defendant's request to see his grandfather, the court's summation of facts
    is supported by substantial evidence.
18
    We must independently review whether these facts demonstrate that the confession
19  was voluntary and in compliance with *Miranda*. (See *McCurdy, supra*, 59 Cal.4th
    at pp. 1085-1086; *Tully, supra*, 54 Cal.4th at p. 979.)
20
            *Voluntariness of Defendant's Confession*
21
    A statement obtained by a direct or implied promise, however, slight, is considered
22  involuntary. (*Hutto v. Ross* (1976) 429 U.S. 28, 30; *People v. McWhorter* (2009)
    47 Cal.4th 318, 347 (*McWhorter*); *People v. Neal* (2003) 31 Cal.4th 63, 79 (*Neal*).)
23  Such promises defeat an inference that the suspect's decision to speak is self-
    motivated and free from a promise of reward or advantage. (*Tully, supra*, 54
24  Cal.4th at p. 985.) However, "[a] confession is 'obtained' by a promise within the
    proscription of both the federal and state due process guaranties if and only if
25  inducement and statement are linked, as it were, by 'proximate' causation."
    (*People v. Benson* (1990) 52 Cal.3d 754, 778; accord, *People v. Williams* (2010)
26  49 Cal.4th 405, 437 (*Williams*).) In evaluating this question, we must examine
    "'"all the surrounding circumstances—both the characteristics of the accused and
27  the details of the interrogation."'" (*McWhorter, supra*, 47 Cal.4th at p. 347.)

28  In cases where an accused has alleged his or her confession was improperly

                                        19

induced by a promise, the promise has generally involved leniency for the accused or a close family member or associate. (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 209-214 [collecting cases, and concluding the defendant's confession was involuntary because the police "repeatedly suggested [he] would be treated more leniently if he confessed"]; see *People v. Steger* (1976) 16 Cal.3d 539, 550 ["A threat by police to arrest or punish a close relative, or a promise to free the relative in exchange for a confession, may render an admission invalid"]; *People v. Perez* (2016) 243 Cal.App.4th 863, 876 [concluding officer's promise not to charge the defendant if he told the truth was an express promise of leniency that required suppression of the confession]; *People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1404 [concluding police officer's statements constituted implied promises of leniency for the defendant's girlfriend, but that the confession was not coerced because the defendant was sophisticated and knew the officer's implied promises were hollow].) These cases frequently involve a threat: that the accused's family or friends will face grave consequences if the accused does not confess. (*McWhorter, supra,* 47 Cal.4th at pp. 342, 348 [threats to charge the defendant's wife as an accessory if he did not confess rendered confession involuntary]; *Dowdell,* at p. 1402 [police emphasized the defendant needed to "'save'" his pregnant girlfriend from possible life imprisonment by confessing]; cf. *Steger,* at p. 550 [police made no threat or promise—either express or implied—regarding fate of the defendant's husband; the defendant's desire to aid her husband by confessing was entirely self-motivated].)

Here, the promise of reward, if any, did not involve leniency, but rather an opportunity for defendant to speak with his grandfather prior to being transported. There was no threat to defendant if he did not confess. At most, his opportunity to speak with his grandfather would have been delayed. Defendant does not cite, and we do not find, any cases suppressing a confession on a similar basis. (Cf. *People v. Dreas* (1984) 153 Cal.App.3d 623, 629, 632 [rejecting the defendant's claim that temporary denial of the use of a telephone to call a friend until after booking and interview did not constitute coercive conduct]; *People v. Stoner* (1962) 205 Cal.App.2d 108, 115 ["It strains one's credulity to suggest that [the] defendant would involuntarily confess to a crime merely because he was required to wait before making a telephone call."], reversed on other grounds by *Stoner v. California* (1964) 376 U.S. 483.)

Moreover, we find it significant that it was defendant himself who raised the possibility of speaking with his grandfather in exchange for his confession. (See *People v. Barker* (1986) 182 Cal.App.3d 921, 929-933 [determining confession was voluntary where the defendant initiated the discussion of lenient treatment for his girlfriend].) While defendant makes much of the fact that this offer came only after Scott refused to let him speak with his grandfather, Scott testified his refusal was based on ordinary procedure. (See *McWhorter, supra,* 47 Cal.4th at pp. 354-358 [holding that a confession was not involuntary where the defendant's wife was brought to the police station for a legitimate reason, and not for the purpose of encouraging the defendant to confess]; *People v. Jackson* (1971) 19 Cal.App.3d 95, 100 [that officers had a legitimate basis for detaining the defendant's wife supported a conclusion the defendant's confession was not coerced and that his wife was not held in custody solely for the purpose of securing his confession].) Scott did not offer defendant any benefit in exchange for his confession; rather, defendant offered his confession in exchange for a benefit. On these facts, we cannot conclude that an offer by Scott was the motivating factor behind defendant's decision to confess. (See *Tully, supra,* 54 Cal.4th at p. 985 [promise of leniency must be a "'motivating cause of the decision to confess'"].)

20

1   Finally, nothing else about the interviews suggest coercion. The trial court found
    that both interviews were "low key," and that Scott was not overbearing or
2   insistent in his approach. Defendant does not dispute this characterization. Nothing
    about the characteristics of the accused or the conditions of the interrogation
3   suggest defendant's will was overborne when he confessed. (*McWhorter, supra*,
    47 Cal.4th at p. 347; accord, *Lynumn v. Illinois* (1963) 372 U.S. 528, 534 [the test
4   for determining whether a confession is voluntary is whether the defendant's "will
    was overborne at the time he confessed"].)

5
    Considering the totality of the circumstances surrounding the confession, we
6   conclude the confession was voluntary. (*McCurdy, supra*, 59 Cal.4th at p. 1086.)

7                  *Alleged Invocation of Miranda Rights*

8   Defendant contends he invoked his right to remain silent at the conclusion of the
    interview in the interview room, and that his subsequent confession in the
9   processing area violated *Miranda*.

10  We first note that this issue is forfeited. Below, defendant's briefing contained
    boilerplate references to the confession violating *Miranda*. Defendant noted in
11  passing that there was no readvisement of *Miranda* rights during the processing
    interview. However, he did not identify any instance in which he claimed to have
12  invoked his right to remain silent. The trial court was not apprised that it was being
    called upon to decide this issue. (*People v. Holt* (1997) 15 Cal.4th 619, 666;
13  *People v. Ray* (1996) 13 Cal.4th 313, 339.) Nonetheless, we address the issue on
    the merits given defendant's claim that counsel was constitutionally ineffective for
14  failing to raise it. (See *People v. Hardy, supra*, 2 Cal.4th at p. 209.)

15  In *Miranda*, the United States Supreme Court held that "the prosecution may not
    use statements, whether exculpatory or inculpatory, stemming from custodial
16  interrogation of the defendant unless it demonstrates the use of procedural
    safeguards effective to secure the privilege against self-incrimination." (*Miranda,
17  supra*, 384 U.S. at p. 444.) Thus, "suspects interrogated while in police custody
    must be told that they have a right to remain silent, that anything they say may be
18  used against them in court, and that they are entitled to the presence of an attorney,
    either retained or appointed, at the interrogation." (*Thompson v. Keohane* (1995)
19  516 U.S. 99, 107.)

20  The waiver of *Miranda* rights may be express or implied. (See *North Carolina v.
    Butler* (1979) 441 U.S. 369, 373-375.) However, the invocation of the right to
21  remain silent or the right to counsel must be unambiguous and unequivocal.
    (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381-382.) The suspect must
22  articulate his desire to remain silent or have counsel present with sufficient clarity
    that a reasonable police officer in the same circumstances would understand the
23  statement to be an invocation of the suspect's constitutional rights. (*Davis v.
    United States* (1994) 512 U.S. 452, 459.) If a suspect makes a clear and
24  unambiguous statement invoking his constitutional rights, "all questioning must
    cease." (*Smith v. Illinois* (1984) 469 U.S. 91, 98.) A suspect's "simple,
25  unambiguous" statement that he "wanted to remain silent or that he did not want to
    talk with the police" is generally sufficient to invoke his "'''right to cut off
26  questioning.'''" (*Berghuis*, at p. 382.)

27  A suspect who has waived his *Miranda* rights may later invoke them during the
    interrogation. If he clearly and unequivocally does so, police must stop
28  questioning. (*Edwards v. Arizona* (1981) 451 U.S. 477, 485; *Miranda, supra*, 384

                                    21

U.S. at pp. 473-474; *People v. Stitely* (2005) 35 Cal.4th 514, 535.) However, if the suspect thereafter voluntarily reinitiates contact with the police, the interrogation may resume. (*Edwards*, at p. 485; *People v. Gamache* (2010) 48 Cal.4th 347, 384.) Whether readvisement of *Miranda* rights is required following a break in questioning depends on several factors. (*People v. Duff* (2014) 58 Cal.4th 527, 555 (*Duff*).)

Here, defendant's interview in the interview room concluded as follows:

> "SCOTT: All right, man, we're leavin' – we're leavin' the room.

> "[DEFENDANT]: All right.

> "SCOTT: You wanna tell me?

> "[DEFENDANT]: I won't tell you (unintelligible). I got nothin' to say, bro.

> "SCOTT: (Unintelligible).

> "[DEFENDANT]: You know I mean?

> "SCOTT: (Unintelligible).

> "[DEFENDANT]: Better off my chances in there (unintelligible) somethin'.

> "SCOTT: (Unintelligible).

> "[DEFENDANT]: (unintelligible)."

Defendant contends his statement, "I won't tell you (unintelligible). I got nothin' to say, bro," was an unequivocal invocation of his right to remain silent. However, this statement does not constitute an unambiguous and unequivocal directive to end the interview. (*Williams, supra*, 49 Cal.4th at pp. 433-434 [suspect's statement, "'I don't want to talk about it,'" was not an invocation of *Miranda* rights]; *People v. Ashmus* (1991) 54 Cal.3d 932, 969-970 ["'now I ain't saying no more'" was not an invocation of the right to remain silent], abrogated on another ground by *People v. Yeoman* (2003) 31 Cal.4th 93, 117; *People v. Silva* (1988) 45 Cal.3d 604, 629-630 ["'I really don't want to talk about that'" was not an invocation of *Miranda* rights].) The statement did not come before the interrogation got underway, but rather at the conclusion of a lengthy interview, after Scott indicated he was leaving the room. (*People v. Case* (2018) 5 Cal.5th 1, 21 [distinguishing invocation of right to silence before the interrogation is in process, from that which cuts off a particular line of questioning during an ongoing interrogation].) Defendant also continued to speak thereafter. In this context, a reasonable officer could interpret defendant's statement as a continued denial of any knowledge concerning the crime, or an expression of frustration with the nature of the questioning, rather than an attempt to terminate the interrogation. (*Williams*, at pp. 433-434.)

Defendant also appears to contend Scott was required to readvise him of his *Miranda* rights prior to questioning him again in the booking area. "'[R]eadvisement prior to continued custodial interrogation is unnecessary "so long as a proper warning has been given, and 'the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver.'"'"

(*Duff, supra*, 58 Cal.4th at p. 555.) "'The necessity for readvisement depends upon various circumstances, including the amount of time that has elapsed since the first waiver, changes in the identity of the interrogating officer and the location of the interrogation, any reminder of the prior advisement, the defendant's experience with the criminal justice system, and "[other] indicia that the defendant subjectively underst[ood] and waive[d] his rights."'" (*Ibid.*) Here, Scott was not required to readvise defendant, because the second interrogation occurred mere moments after the first and was conducted by the same interrogator, in the same facility (albeit in another room). Additionally, defendant demonstrated no reluctance to be interviewed but instead volunteered to provide information. On these facts, Scott did not have to remind defendant of his rights.

Finally, we reject defendant's attempt to liken his interrogation to that presented in *Neal, supra*, 31 Cal.4th 63. In *Neal*, the defendant invoked his right to remain silent at the outset of the interrogation, and also repeatedly invoked his right to counsel, which invocations were intentionally disregarded by officers who continued their substantive interrogation. (*Id.* at pp. 81-82.) When the defendant failed to incriminate himself, the interrogating officers placed him in a cell overnight without food, drink, or toilet facilities. (*Id.* at p. 82.) The following day, the defendant initiated another interview, where he immediately confessed. (*Id.* at p. 81.) He confessed again in a third interview initiated by officers. (*Ibid.*) However, because the invocation of his *Miranda* rights was not honored in the first interview, and because he was threatened with "'heavier'" charges if he did not cooperate, our Supreme Court determined the confessions were involuntary. (*Id.* at pp. 81-84.) In contrast, here, defendant did not invoke his *Miranda* rights at any point in the interrogation, nor was he threatened with any penal consequences for his failure to cooperate.

We conclude defendant's confession was not elicited in violation of his *Miranda* rights.

(Doc. 40-15 at 15-26.)

### a.     Procedural Default

Respondent contends that Petitioner is procedurally barred from raising his claim that his confession was elicited after a clear invocation of his right to remain silent. As noted by Respondent, the state court found that Petitioner had forfeited this claim by failing to raise his objections to the trial court for determination.

A federal court will not review a claim of federal constitutional error raised by a state habeas petitioner if the state court determination of the same issue "rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). This rule also applies when the state court's determination is based on the petitioner's failure to comply with procedural requirements, so long as the procedural rule is an adequate and independent basis for the denial of relief. Id. at 730. For the

23

1    bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of

2    the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997).  For the bar to

3    be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S.

4    1032, 1040-41 (1983).  If an issue is procedurally defaulted, a federal court may not consider it

5    unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

6    alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

7    fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

8           The Ninth Circuit has repeatedly held that California's contemporaneous objection

9    doctrine is clear, well-established, has been consistently applied, and is an adequate and

10   independent state procedural rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002);

11   Vansickel v. White, 166 F.3d 953 (9th Cir. 1999).  Thus, by failing to object to the admission of

12   his confession on the specific basis that it was obtained in violation of his clear invocation of his

13   right to remain silent, Petitioner waived his claim in state court and is procedurally barred from

14   raising it here.  As discussed *infra*, the claim is also without merit.

15                        b.      Legal Standards and Analysis

16          The Fifth Amendment provides that "no person shall be compelled in any criminal case to

17   be a witness against himself."  A suspect subject to custodial interrogation has a Fifth

18   Amendment right to consult with an attorney, and the police must explain this right prior to

19   questioning.  Miranda v. Arizona, 384 U.S. 436, 469–73 (1966).  In Miranda, the United States

20   Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or

21   inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the

22   use of procedural safeguards effective to secure the privilege against self-incrimination."  384

23   U.S. at 444.  Custodial interrogation must be preceded by advice to the potential defendant that he

24   or she has the right to consult with a lawyer, the right to remain silent and that anything stated can

25   be used in evidence against him or her.  Id. at 473-74.  These procedural requirements are

26   designed "to protect people against the coercive nature of custodial interrogations."  DeWeaver v.

27   Runnels, 556 F.3d 995, 1000 (9th Cir. 2009).  Miranda warnings are "not themselves rights

28   protected by the Constitution but [are] instead measures to ensure that the right against

                                                    24

1  compulsory self-incrimination [is] protected." <u>Oregon v. Elstad</u>, 470 U.S. at 305 (quoting

2  <u>Michigan v. Tucker</u>, 417 U.S. 433, 444 (1974)).

3              *i.    Coercion*

4        Petitioner first contends that his confession was coerced.  In determining whether a

5  confession is voluntary, "the question is 'whether the defendant's will was overborne at the time

6  he confessed.'" <u>Haynes v. Washington</u>, 373 U.S. 503, 513 (1963); <u>see also</u> <u>Amaya–Ruiz v.

7  Stewart</u>, 121 F.3d 486, 494 (9th Cir.1997) (the test is "whether ... the government obtained the

8  statement by physical or psychological coercion or by improper inducement so that the suspect's

9  will was overborne."). "The line of distinction is that at which governing self-direction is lost and

10  compulsion, of whatever nature or however infused, propels or helps to propel the confession."

11  <u>Collazo v. Estelle</u>, 940 F.2d 411, 416 (9th Cir.1991) (en banc) (quoting <u>Culombe v. Connecticut</u>,

12  367 U.S. 568, 602 (1961)); <u>see also</u> <u>Pollard v. Galaza</u>, 290 F.3d 1030, 1033 (9th Cir.2002)

13  ("Under the Fourteenth Amendment, a confession is involuntary only if the police use coercive

14  means to undermine the suspect's ability to exercise his free will.").

15        "There is no 'talismanic definition of 'voluntariness" that is 'mechanically applicable.'"

16  <u>Clark v. Murphy</u>, 331 F.3d 1062, 1072 (9th Cir.2003), *overruled in part on other grounds by*

17  <u>Lockyer v. Andrade</u>, 538 U.S. 63 (2003) (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 224

18  (1973)). Rather, voluntariness is to be determined in light of the totality of the circumstances. <u>See</u>

19  <u>Miller v. Fenton</u>, 474 U.S. 104, 112 (1985). This includes consideration of both the characteristics

20  of the petitioner and the details of the interrogation. <u>Schneckloth</u>, 412 U.S. at 226 (The court must

21  examine "the factual circumstances surrounding the confession, assess [ ] the psychological

22  impact on the accused, and evaluate [ ] the legal significance of how the accused reacted."); <u>see

23  also</u> <u>United States v. Haswood</u>, 350 F.3d 1024, 1027 (9th Cir.2003) ("Courts ... often consider the

24  following factors: the youth of the accused, his intelligence, the lack of any advice to the accused

25  of his constitutional rights, the length of detention, the repeated and prolonged nature of the

26  questioning, and the use of physical punishment such as the deprivation of food or sleep."); <u>Clark</u>,

27  331 F.3d at 1072; <u>Henry</u>, 197 F.3d at 1026 ("[v]oluntariness depends on such factors as the

28  surrounding circumstances and the combined effect of the entire course of the officers' conduct

1    upon the defendant").

2         "A confession is involuntary if coerced either by physical intimidation or psychological

3    pressure." Haswood, 350 F.3d at 1027; United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir.

4    1981) ("subtle psychological coercion suffices ... at times more effectively 'to overbear a rational

5    intellect and a free will'"). In the end the court must determine under the totality of the

6    circumstances whether "the government obtained the statement by physical or psychological

7    coercion or by improper inducement so that the suspect's will was overborne." Beaty v. Stewart,

8    303 F.3d 975, 992 (9th Cir.2002) (quoting United States v. Leon Guerrero, 847 F.2d 1363, 1366

9    (9th Cir.1988)); see also Hutto v. Ross, 429 U.S. 28, 30.

10        Here, the state court reasonably determined that Petitioner was not coerced into

11   confessing.  Petitioner was not threatened in any way.  The interviews were characterized as "low

12   key," and law enforcement were not overbearing or insistent in their approach.  Nor was there any

13   promise or reward of leniency in exchange for his statement.  As noted by the state court, at most

14   Petitioner's opportunity to speak to his grandfather would have been delayed.  Moreover, it was

15   not the officer but Petitioner himself who made the request that he be able to speak to his

16   grandfather prior to being transported in exchange for his confession.  There is no indication that

17   Petitioner's grandfather could not have visited him in jail after he had been transported.  The state

18   court reasonably found that nothing about the circumstances of the interrogation suggested that

19   Petitioner's will had been overborne.

20                    *ii.      Invocation of Right to Remain Silent*

21        Petitioner next contends that once he invoked his right to remain silent, all interrogation

22   should have ceased.  He contends his confession should have been suppressed because it occurred

23   after he invoked his right.

24        Once Miranda warnings have been given, if a suspect makes an unambiguous statement

25   invoking his constitutional rights, "all questioning must cease." Smith v. Illinois, 469 U.S. 91, 98

26   (1984); see also Miranda, 384 U.S. at 473-74; Michigan v. Mosley, 423 U.S. 96, 100 (1975).

27   Any subsequent statements are relevant only to the question whether the accused waived the right

28   he had previously invoked. Smith, 469 U.S. at 98. "Invocation and waiver are entirely distinct

1  inquiries, and the two must not be blurred by merging them together." Id.

2         Invocation of the right to remain silent must be construed liberally. See Hofman v. United

3  States, 341 U.S. 479, 486 (1951). Thus, a suspect need not rely on any special combination of

4  words to invoke the right to silence. Quinn v. United States, 349 U.S. 155, 162 (1955); see also

5  Miranda, 384 U.S. at 473-74 (a suspect's assertion of the right to remain silent "in any manner"

6  compels the police to cease questioning). To determine whether a suspect invoked his Fifth

7  Amendment rights, "a court should examine the entire context in which the claimant spoke."

8  Bradley v. Meachum, 918 F.2d 338, 342 (2d Cir.1990) (quoting United States v. Goodwin, 470

9  F.2d 893, 902 (5th Cir. 1972)).

10         The United States Supreme Court has rejected an automatic proscription of any further

11  interrogation once the person questioned has indicated a desire to remain silent. Mosley, 423 U.S.

12  at 102-03 (rejecting the proposition that the Miranda decision barred law enforcement officials

13  from ever questioning a suspect after the suspect had invoked his right to remain silent).

14  Accordingly, voluntary statements later initiated by the suspect are not *per se* inadmissible.

15  Miranda, 384 U.S. at 478 ("[v]olunteered statements of any kind are not barred by the Fifth

16  Amendment"). However, the admissibility of statements obtained after the person in custody has

17  decided to remain silent depends under Miranda on whether the suspect's 'right to cut off

18  questioning' was 'scrupulously honored.'" Mosley, 423 U.S. at 104; see also United States v.

19  Hsu, 852 F.2d 407 (9th Cir.1988) (defendant's Fifth Amendment rights were not violated when

20  police readministered Miranda warnings and resumed questioning on same crime approximately

21  30 minutes after defendant had invoked his right to remain silent); United States v. Andrade, 135

22  F.3d 104 (1st Cir. 1998) (no Fifth Amendment violation where defendant was advised of his

23  Miranda rights and invoked his right to remain silent but spoke to the officers several hours later

24  after his sister called him at the officers' request and implored him to do so).

25         A valid waiver of Miranda rights depends upon the totality of the circumstances, including

26  the background, experience and conduct of the defendant. See United States v. Bernard S., 795

27  F.2d 749, 751 (9th Cir.1986). The government must prove waiver by a preponderance of the

28  evidence. Colorado v. Connelly, 479 U.S. 157, 168-69 (1986); Lego v. Twomey, 404 U.S. 477,

488-89 (1972); Terrovona v. Kincheloe, 912 F.2d 1176, 1180 (9th Cir. 1990). The waiver need not be express as long as the totality of the circumstances indicates that the waiver was knowing and voluntary. North Carolina v. Butler, 441 U.S. 369, 373 (1979); Juan H. v. Allen, 408 F.3d 1262, 1271 (9th Cir. 2005).  Although the burden is on the government to prove voluntariness, a waiver cannot be held involuntary absent official compulsion or coercion. See Colorado, 479 U.S. at 170 ("Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that.").

Based on a review of the record and the applicable law, the Court finds that the state court reasonably determined that Petitioner did not unambiguously and unequivocally invoke his right to remain silent.  The appellate court's determination that "I won't tell you (unintelligible). I got nothin' to say, bro" was not an unequivocal assertion of the right to remain silent but rather indicated denial of his involvement in the crime.  Although reasonable minds could differ on this question, the state court's conclusion in this regard is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S.Ct. at 786–87.  In short, a reasonable police officer could have failed to interpret these remarks as an invocation of his rights and a demand to terminate the entire interview.  In any event, any possible ambiguity in this regard would have been erased when Petitioner reinitiated discussion of the matter after officers began the booking and transportation process.  Petitioner's offer to tell officers "what happened" after the alleged invocation of his right to remain silent belies an intention to terminate the interview. See Bradley, 918 F.2d at 342–43.

In sum, the state appellate court's conclusion that Petitioner's confession was not coerced or elicited after a clear invocation of his right to remain silent, was not contrary to or an unreasonable application of federal authority, nor was it based on an unreasonable determination of the facts. Accordingly, Petitioner is not entitled to habeas relief on this ground.

### 3.  Claim Three

Petitioner next contends the trial court did not properly instruct the jury on voluntary intoxication.  Although the court instructed the jury on voluntary intoxication, it did so by

omitting the word "or" from the pattern instruction.  Petitioner contends that the instruction: 1) allowed the jury to assume the factors of premeditation and deliberation were already established; and 2) disallowed the jury from considering whether voluntary intoxication negated a finding of premeditation or deliberation.  Petitioner raised this claim on direct review.  In the last reasoned decision, the appellate court rejected the claim, as follows:

> The court's instruction on voluntary intoxication omitted the word, "or." Defendant contends this error changed the meaning of the instruction in such a way as to erroneously inform the jury that the question of premeditation and deliberation had already been decided, and that voluntary intoxication could not negate deliberation and premeditation. We conclude there is no reasonable possibility the jury interpreted the instruction as defendant suggests and, in any event, any error was harmless.

> *Additional Factual Background*

> The court instructed the jury on the elements of first degree murder, including the requirement that the defendant act willfully, deliberately, and with premeditation. The court additionally instructed the jury with a modified version of CALCRIM No. 625, concerning voluntary intoxication. [Fn.11]

>> [Fn.11] Defendant did not object to the instruction in the trial court. However, because defendant claims the instruction affected his substantial rights, we reach the merits of the argument despite the People's claim of forfeiture. (§ 1259; see *People v. Nelson* (2016) 1 Cal.5th 513, 543.)

> The model instruction for CALCRIM No. 625 in effect at the time of trial read, as it does now, as follows:

>> "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. *You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted[,]] [or the defendant ____ <insert other specific intent required in a homicide charge or other charged offense>.]*

>> "A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

>> "You may not consider evidence of voluntary intoxication for any other purpose." (CALCRIM No. 625, some italics added.)

> The court's oral instruction was presented as follows:

>> "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. *You may consider that evidence only in deciding whether the defendant acted with an intent to kill. The defendant acted with deliberation and premeditation.* A person is voluntarily

intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink or other substance knowing that it could produce an intoxicating effect or willingly assume the risk of that effect. You may not consider evidence of voluntary intoxication for any other purpose." (Italics added.)

The court's written instruction was presented as follows:

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. *You may consider that evidence only in deciding whether the defendant acted with an intent to kill, *[the defendant acted with deliberation and premeditation,]**

"A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"You may not consider evidence of voluntary intoxication for any other purpose." (Italics added, original brackets & asterisks.)

*Analysis*

We independently determine whether instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73 & fn. 4; *Boyde v. California* (1990) 494 U.S. 370, 380 (*Boyde*).) We also consider the arguments of counsel in assessing the probable impact of the instruction or instructions on the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1202; see *Weeks v. Angelone* (2000) 528 U.S. 225, 236.) "'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.' [Citation.] When a defendant claims an instruction was subject to erroneous interpretation by the jury, he must demonstrate a reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted. [Citation.] In determining the correctness of jury instructions, we consider the entire charge of the court, in light of the trial record." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 926.)

Here, both the oral and written instructions provided by the court deviated from the model instruction in their grammatical structure by omitting the word "or." Additionally, the written instruction referred to premeditation and deliberation in an unexplained, bracketed parenthetical, while transcription of the oral instruction suggests the reference to premeditation and deliberation was a separate, stand-alone sentence. Defendant claims that the effect of both instructions was to inform the jury that evidence of voluntary intoxication was relevant only to the question of whether defendant acted with the intent to kill, and that the issue of premeditation and deliberation was already decided. However, "[w]e credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions." (*People v. Coddington* (2000) 23 Cal.4th 529, 594, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) In our view, there is no reasonable likelihood the jury would parse the instruction in the way defendant suggests. (See *People v. Kelly* (2007) 42 Cal.4th 763, 791; see also *Boyde, supra,*

30

1    494 U.S. at pp. 380-381.)

2    Significantly, the jury was instructed that it could find defendant guilty of first
     degree murder only if the People proved, beyond a reasonable doubt, that he acted
3    willfully, deliberately, and with premeditation. The instructions defined each of
     these terms at some length. In closing argument, the prosecutor stated the issues in
4    the case were "pretty limited," to the issues of whether defendant was the shooter
     and whether he acted with premeditation and deliberation. The prosecutor then
5    argued facts he believed showed premeditation and deliberation as to each victim.
     [Fn.12] Considering this record, we see no reasonable likelihood the jury could
6    have interpreted the instruction on voluntary intoxication to mean the issues of
     premeditation and deliberation already were decided.

7
            [Fn.12] Defense counsel did not address premeditation or deliberation in
8           closing argument, and instead argued the People had not proved defendant
            was the shooter.

9
     Nor do we find it reasonably likely the jury interpreted this instruction to mean
10   that voluntary intoxication could not be considered in determining whether
     defendant acted with premeditation or deliberation. Again, the written instruction
11   provided: "You may consider that evidence only in deciding whether the defendant
     acted with an intent to kill, *[the defendant acted with deliberation and
12   premeditation, ]*." Defendant contends the only rational interpretation of this
     instruction "is that the jury was allowed to consider evidence of voluntary
13   intoxication only on the question of whether [defendant] acted with an intent to
     kill, not whether he acted with deliberation and premeditation." We do not find
14   this to be a rational interpretation. The phrase "the defendant acted with
     deliberation and premeditation" was linked to the preceding material within the
15   same sentence by a comma. The phrase was followed by another comma and
     additional material that was struck through with a marker. Despite the brackets and
16   asterisks, [Fn.13] the structure of the instruction clearly indicates the issue of
     voluntary intoxication could be considered in determining whether the defendant
17   acted with deliberation and premeditation. The omission of the word "or" was a
     minor deviation that did not "materially alter the instruction's meaning." (*People*
18   *v. Huggins* (2006) 38 Cal.4th 175, 192 (*Huggins*) [concluding the omission of the
     word "and" from an instruction defining mental incompetence for purposes of a
19   competency hearing "did not materially alter the instruction's meaning"].)

20          [FN13] Brackets, asterisks, and strike throughs appeared throughout the
            written instructions, which appear to have been modified directly from
21          printouts of form instructions. Given the prevalence of such markings, we
            reject defendant's contention that the jury interpreted these notations in the
22          instruction on voluntary intoxication to represent "the trial court's voice or
            [a] parenthetical note to the jury."

23
     The oral instruction differed slightly in form from the written instruction, in that it
24   obviously did not include the brackets, asterisks, or strike-through markings.
     Additionally, the relevant portion of the instruction was transcribed in two
25   sentences as follows: "You may consider that evidence only in deciding whether
     the defendant acted with an intent to kill. The defendant acted with deliberation
26   and premeditation." "'To the extent a discrepancy exists between the written and
     oral versions of jury instructions, the written instructions provided to the jury will
27   control.'" (*People v. Edwards* (2013) 57 Cal.4th 658, 746.) Nonetheless, we reject
     defendant's contention that the separation of this phrase into two sentences in the
28   transcript precluded the jury from considering voluntary intoxication when

                                              31

deciding the question of premeditation and deliberation. We are not bound by the transcribed punctuation:

> "Of course, when the court orally instructs the jury, the court reporter cannot always capture and report the court's intended punctuation. Speakers seldom indicate punctuation as they speak, leaving the court reporter with the always difficult, and sometimes impossible, task of supplying punctuation that reflects the speaker's cadence and inflection. Although we rely upon the court reporter to accurately record the words spoken in court, we are not bound by the court reporter's interpretation of the speaker's intended meaning as shown by the punctuation inserted by the reporter." (*Huggins, supra*, 38 Cal.4th at p. 190.)

Moreover, even if the instruction was ambiguous, the instruction was harmless. The California Supreme Court has held that an instructional error restricting a jury's consideration of voluntary intoxication would have the effect of excluding defense evidence and amounts to state law error only. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134-1135; accord, *People v. Bedolla* (2018) 28 Cal.App.5th 535, 545.) Accordingly, we apply the standard set out in People v. Watson (1956) 46 Cal.2d 818, 836, and will reverse only if we find a "'reasonable probability the error affected the verdict adversely to defendant.'" (*Mendoza*, at pp. 1134-1135.) We find no such probability.

First, defendant's own account of the shooting does not suggest defendant's ability to premeditate or deliberate was inhibited by intoxication. Although there was evidence that defendant had been drinking for some time before the shootings, he confessed that he shot Villegas because Villegas had not paid him, and shot Ceja because Ceja was a witness. He did not suggest his judgment was affected by intoxication. Second, defendant did not actually argue a voluntary intoxication defense to the jury, and the prosecutor likewise did not address this defense. Lastly, the jury was instructed that murder in the first degree requires the unlawful intent to kill, and that it could consider the effect of voluntary intoxication on this issue. In finding defendant guilty, the jury necessarily rejected this defense. Considering the entire charge of the court and the presentation of the case, it is inconceivable that a jury would have concluded defendant was too intoxicated to premeditate and deliberate the murders, but not too intoxicated to form an intent to kill. (*People v. Chun* (2009) 45 Cal.4th 1172, 1204-1205 [finding error harmless where jury verdict on other points effectively resolves the disputed point]; see *People v. Castillo* (1997) 16 Cal.4th 1009, 1017 ["No reasonable juror would understand the instructions to permit the jury to consider intoxication in determining whether defendant specifically intended to kill but to prohibit it from considering that same intoxication in determining whether he premeditated and deliberated."].)

We find no reasonable likelihood the jury would misunderstand the instructions in the way defendant suggests, nor any reasonable probability that different instructions would have resulted in a verdict more favorable to defendant.

(Doc. 40-15 at 26-32.)

### a.     Legal Standard

Initially, the Court notes that a claim that a jury instruction violated state law is not cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain

federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Id. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).

An erroneous jury instruction "directed toward an element of the offense may rise to the level of a constitutional defect."  Byrd v. Lewis, 566 F.3d 855, 862 (9th Cir.2009) (citing Neder v. United States, 527 U.S. 1, 9-10 (1999)). "Due process requires that jury instructions in criminal trials give effect to the prosecutor's burden of proving every element of the crime charged beyond a reasonable doubt. [Citation] 'Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.'" Townsend v. Knowles, 562 F.3d 1200, 1209 (9th Cir.2009) (quoting Middleton v. McNeil, 541 U.S. 433, 437 (2004)).

Generally, the failure to instruct on an element of the offense is considered to be an error in the trial process - not a structural error affecting the framework within which the trial proceeds - and is thus subject to harmless error review.  See e.g., United States v. Smith, 561 F.3d 934, 938 (9th Cir. 2009); Evanchyk v. Stewart, 340 F.3d 933, 940 (9th Cir. 2003).  A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

b.     Analysis

Petitioner's first claim that the omission of the word "or" in the pattern voluntary intoxication instruction permitted the jury to conclude that premeditation and deliberation was already established is without merit.  As discussed by the appellate court, the jury was instructed that it could not find Petitioner guilty of first degree murder unless the People proved beyond a reasonable doubt that Petitioner acted willfully, deliberately, and with premeditation.  The trial court then defined each of those terms. Further, the prosecution argued that Petitioner acted with premeditation and deliberation.  There is no likelihood that the jury could have believed from the separated clauses within the voluntary intoxication instruction that the issues of premeditation and deliberation were already decided.  Petitioner fails to show that no rational jurist would have agreed with the appellate court's decision.

Petitioner's second argument that the wording in the instruction would have disallowed the jury from considering voluntary intoxication as to premeditation and deliberation is also without merit.  The relevant portion of the oral instruction was transcribed as two separate clauses, but this merely reflected the court reporter's interpretation.  The court reporter cannot be expected to supply the correct punctuation in every case, since speakers rarely indicate punctuation when they speak.  In any case, under California law, the written instructions control and "misreading instructions is at most harmless error when the written instructions received by the jury are correct."  People v. Box, 23 Cal.4th 1143, 1212 (2000), *disapproved on another ground in* People v. Martinez, 47 Cal.4th 911, 948 n.10 (2010).

In the written instructions, on the other hand, the clauses were separated by a comma.  The appellate court reasonably determined that a fair and rational reading of the instruction would have led the jury to consider voluntary intoxication with respect to the intent to kill, premeditation and deliberation, and not limited only to the intent to kill.  The omission of the word "or" did not alter the instruction's meaning.  Petitioner fails to show that the state court's interpretation was unreasonable.

The state court also reasonably determined that any error was harmless and that there was no reasonable probability the error affected the verdict.  The appellate court noted that

34

1  Petitioner's own description of the shooting did not suggest his ability to premeditate or

2  deliberate was affected by intoxication.  Petitioner stated he shot Villegas because he failed to pay

3  him, and he shot Ceja because Ceja was a witness.  Second, the appellate court pointed out that

4  the defense did not argue voluntary intoxication to the jury, and the prosecutor did not address the

5  issue. Third, the jury was fully instructed that murder required the intent to kill.  The court

6  reasonably found it inconceivable that the jury could find defendant too intoxicated to

7  premeditate and deliberate the murders yet find he was not too intoxicated to form an intent to

8  kill.

9        The state court's rejection of the claim was a reasonable application of Supreme Court

10  precedent, and the state court did not base its decision on an unreasonable determination of the

11  facts.  The claim should be denied.

12              4.  Ground Four

13        Petitioner next contends that the trial court erroneously instructed the jury on flight.  He

14  contends that there was no evidence which would have supported such an instruction.  This claim

15  was also raised and rejected on direct review.  In the last reasoned decision, the appellate court

16  denied relief as follows:

17      Defendant contends the trial court prejudicially erred in instructing the jury on
        flight, over a defense objection, because there was no evidence to support a
18      conclusion that defendant fled.[FN14] We disagree.

19          [FN14] The court instructed the jury with CALCRIM No. 372 as follows:
            "If the defendant fled immediately after the crime was committed, that
20          conduct may show that he was aware of his guilt. If you conclude the
            defendant fled, it's up to you to decide the meaning and importance of that
21          conduct. However, evidence the defendant fled cannot prove guilt by
            itself."
22

23      "'In general, a flight instruction "is proper where the evidence shows that the
        defendant departed the crime scene under circumstances suggesting that his
24      movement was motivated by a consciousness of guilt." [Citations.] "'[F]light
        requires neither the physical act of running nor the reaching of a far-away haven.
25      [Citation.] Flight manifestly does require, however, a purpose to avoid being
        observed or arrested.'" [Citation.] "*Mere* return to familiar environs from the scene
26      of an alleged crime does not warrant an inference of consciousness of guilt
        [citations], but the *circumstances* of departure from the crime scene may
27      sometimes do so."'" (*People v. Cage* (2015) 62 Cal.4th 256, 285.) "[T]he facts of
        each case determine whether it is reasonable to infer that flight shows
28      consciousness of guilt." (*People v. Mason* (1991) 52 Cal.3d 909, 941.) The
        evidence of flight need not be uncontradicted. (*People v. Richardson* (2008) 43

                                        35

Cal.4th 959, 1020.) "To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury could find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328, original italics.)

Here, Roberto and Roland both testified that they saw defendant leave Villegas's house soon after the shooting, heading in the direction of his own house. However, they did not describe any specific circumstances of his departure that would warrant an inference defendant acted with consciousness of guilt or acted with a purpose to avoid being observed or arrested, particularly given Lounito's testimony that defendant returned to the scene of the offense some time thereafter and began picking up spent shells. (See *People v. Cage, supra*, 62 Cal.4th at p. 285.)

In addition to this evidence, however, defendant told Scott that he went to sleep after the shooting, then woke up later that night and drove to Bakersfield, where he went to a gas station and then to a "chop shop" to melt down the gun. Departure from the area of the crime and defendant's "usual environs" for purposes of disposing of the weapon used in the crime "logically permits an inference that [defendant's] movement was motivated by guilty knowledge." (*People v. Turner* (1990) 50 Cal.3d 668, 694.) Ultimately, it was for the jury to decide the significance, if any, attributable to that conduct.

Moreover, even if the instruction was unwarranted, defendant cannot establish prejudice. The instruction did not presuppose the existence of flight, but instead left it up to the jury to determine whether defendant's conduct constituted flight, and if so, the weight it was entitled to. (*People v. Visciotti* (1992) 2 Cal.4th 1, 60-61 [finding erroneously given flight instruction harmless because "the instruction did not assume that flight was established, leaving that factual determination and its significance to the jury"].) "In the absence of any evidence of flight . . . , the jury would have understood that the instruction was to that extent inapplicable." (*People v. Elliott* (2012) 53 Cal.4th 535, 584; see *Visciotti*, at p. 61.) There was ample evidence, other than flight, tying defendant to the murders. Based on this record, any error in the giving of CALCRIM No. 372 was harmless. (*People v. Watson, supra*, 46 Cal.2d at p. 836.) We reject defendant's claim to the contrary.

(ECF 40-15 at 32-33.)

a.      Legal Standard and Analysis

Petitioner contends that it was error to instruct the jury on flight where no evidence that Petitioner fled existed.  The claim fails for several reasons. First, the state court reasonably determined that some evidence of flight existed. Specifically, Petitioner told Scott that he left his home to go to Bakersfield where he sought out a "chop shop" to melt the gun.  Second, Petitioner cannot demonstrate that the state court's rejection of the claim was contrary to or an unreasonable application of Supreme Court precedent because the Supreme Court has rejected the premise for this argument:

When, therefore, jurors have been left the option of relying upon a legally

36

1

2

3

> inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence, [citation].

4

> . . . .

5

6

> Indeed, if the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration. The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction.

7   Griffin v. United States, 502 U.S. 46, 59-60 (1991).

8       Third, the state court reasonably found that any error from the instruction was harmless.

9   The jurors were instructed that some of the instructions may not apply depending on their finding

10  of the facts in the case, and they were further advised not to assume that the giving of an

11  instruction suggested anything about the facts. (Doc. 40-1 at 247-48.)  If the jury determined that

12  evidence of flight was nonexistent, the instruction would have been ignored.  There is no

13  reasonable likelihood that the jurors would have presumed guilt based merely on the giving of the

14  instruction.

15      For the foregoing reasons, Petitioner fails to show that the state court unreasonably

16  determined that the instructional error did not have a "'substantial and injurious effect or

17  influence in determining the jury's verdict.'"  Brecht, 507 U.S. at 637. The claim should be

18  denied.

19                  5.  Ground Five

20      In his final claim, Petitioner alleges trial counsel was ineffective in failing to seek out

21  additional evidence of coercion in support of his motion to suppress Petitioner's statements.  He

22  contends counsel could have presented several witnesses attesting to Petitioner's relationship with

23  his grandfather along with an expert witness to testify to the coercive effect Petitioner felt because

24  of his relationship.  Petitioner raised this claim to the Kern County Superior Court in a petition for

25  writ of habeas corpus where it was denied in a reasoned decision.  (Doc. 40-19.)  He then raised it

26  in a habeas petition to the California Supreme Court.  (Doc. 40-20.)  The California Supreme

27  Court denied the petition without comment.  The superior court denied the claim as follows:

28

The only "coercion" mentioned by Petitioner in the Writ is the fact that Petitioner suggested that he would tell the detective what happened if Petitioner was permitted to talk to his grandfather. Petitioner then admitted that he shot Villegas out of rage because Villegas was living better than him, he shot Ceja because Ceja was a witness, and that he drove to a "chop shop" in Bakersfield that same night to melt down the gun.

This issue regarding the coercion of Petitioner's confession was raised in the trial court by Petitioner's counsel. On June 28, 2018, Petitioner's counsel filed motions in limine, including a motion seeking to suppress Petitioner's confession on the grounds that it was the product of improper promises and therefore involuntary.

The trial court conducted an Evidence Code Section 402 hearing regarding Petitioner's statements. The Detective who interviewed Petitioner, and whom Petitioner claimed provided improper promises to Petitioner, testified at the hearing.

The trial court denied Petitioner's motion as follows:

> The defendant reinitiated the conversation along the lines of 'I'll tell you what happened if you let me talk to my grandfather.' The officer did not say – as I understand the evidence, did not commit one way or the other. It was, 'Tell me what happened first and then' -- and at that point, the defendant made the statements to him that are incriminating in nature, and the officer then got the grandfather.

> There was none of the conduct by the officer that suggests that he was overbearing or insistent or highly skeptical in challenging the defendant's statements along the way. The interview, from what little bit I saw, the part that the defendant was -- did not admit to anything was --- appeared to be relatively low key, which appeared to be somewhat in the nature of the overall testimony of the detective or investigator Scott.

> And the booking process from the audio clips and the testimony of Detective Scott again continued to be a very low-key approach on this interview. And there's nothing in there that suggests to me that [defendant] was manipulated or induced in such a fashion that would taint the admissions to the investigator regarding his involvement in the killing of the two individuals. So I don't find that there's any basis to suppress the statements that were made. There was no incentive that was offered by the officer that would overbear the will of [defendant] to make him make an involuntary statement. The best we have is [defendant] offering a bargain of' Let me talk to my grandfather and I'll tell you what happened,' and the officer saying, 'Well, you tell me what happened, and then you can talk to your grandfather.' I don't see anywhere in that that it's inadmissible or a statement that overbeared [sic] the will of [defendant] such as to make it in any way less than a statement that was voluntarily given by [defendant]."

Petitioner raised this exact issue before the Court of Appeal of the ineffectiveness of his trial counsel in failing to exclude the confession. In his appeal, Petitioner claimed it was the Detective's refusal to let Petitioner speak with his grandfather that precipitated Petitioner's offer to make a further statement which included the confession.

38

The Court of Appeal noted however, the promise of reward, if any, did not involve leniency, but rather an opportunity for Petitioner to speak with his grandfather prior to being transported. There was no threat to Petitioner if he did not confess. At most, his opportunity to speak with his grandfather would have been delayed. Petitioner did not cite, and Court of Appeal did not find, any cases suppressing a confession on a similar basis. The Court of Appeal also found it significant that it was Petitioner himself who raised the possibility of speaking with his grandfather in exchange for his confession.

In his appeal, Petitioner also contended that he invoked his right to remain silent at the conclusion of the interview in the interview room, and that his subsequent confession in the processing area violated *Miranda*. The Court of Appeal found Petitioner did not invoke his *Miranda* rights at any point in the interrogation, nor was he threatened with any penal consequences for his failure to cooperate and concluded Petitioner's confession was not elicited in violation of his *Miranda* rights.

Petitioner does not demonstrate an exception to the general rule that a court will not consider claims on habeas corpus that were raised and rejected on direct appeal. (*In re Harris* (1993) 5 Cal.4th 813).

Petitioner now claims that his counsel should have investigated further into the subject of Petitioner's role as his grandfather's caretaker and, therefore, his intense concern for his grandfather's wellbeing when left unattended. Petitioner contends that if his counsel had investigated further a more persuasive argument that Petitioner's confession was coerced would have been able to be presented.

The entire basis of Petitioner's claim of coercion was not well founded. Even the Court of Appeal could not find a single case holding a claim similar to Petitioner's claim of coercion caused by delaying Petitioner's opportunity to speak with his grandfather which was successful.

Petitioner's trial counsel was not ineffective for failing to investigate further into the amount of worry Petitioner had about his grandfather being left alone. It is very unlikely that more evidence as to the amount of worry Petitioner felt about his grandfather would have altered the outcome of the case. Therefore, not investigating further to obtain more evidence of the level of Petitioner's worry does not give rise to a claim of IAC.

(Doc. 40-19 at 6-8.)

### a.    Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel

1  altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

2  that Strickland does apply where counsel is present but ineffective).

3        To prevail, Petitioner must show two things.  First, he must establish that counsel's

4  deficient performance fell below an objective standard of reasonableness under prevailing

5  professional norms.  Strickland, 466 U.S. at 687-88.  Second, Petitioner must establish that he

6  suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

7  errors, he would have prevailed at trial. Id. at 694. A "reasonable probability" is a probability

8  sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what

9  counsel could have done; rather, it is whether the choices made by counsel were reasonable.

10  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

11        With the passage of the AEDPA, habeas relief may only be granted if the state-court

12  decision unreasonably applied this general Strickland standard for ineffective assistance.

13  Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

14  federal court believes the state court's determination under the Strickland standard "was incorrect

15  but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

16  Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

17  is "doubly deferential" because it requires that it be shown not only that the state court

18  determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

19  Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

20  state court has even more latitude to reasonably determine that a defendant has not satisfied that

21  standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

22  application was unreasonable requires considering the rule's specificity.  The more general the

23  rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

24        In a case such as this where the California Supreme Court denied the claim without

25  comment, the Court "must determine what arguments or theories supported or, as here, could

26  have supported, the state court's decision; and then it must ask whether it is possible fairminded

27  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

28  decision of this Court."  Harrington v. Richter, 562 U.S. at 102.  This is so because in Robinson v.

1   Lewis, 9 Cal. 5th 883, 895-96 (Cal. 2020), the California Supreme Court held that in the habeas

2   context, as opposed to direct review, a habeas petition filed in a higher state court does not

3   constitute a challenge to the lower court's denial of the previous petition.  The habeas petition

4   filed in the California Supreme Court constitutes a new petition invoking the court's original

5   jurisdiction. Id. Nevertheless, the higher habeas court will give great weight to a lower court's

6   findings. Id.

7                          b.       Analysis

8        Here, the superior court reasoned that counsel could not be faulted for failing to uncover

9   more evidence of Petitioner's concern for his grandfather, because no amount of worry would

10  have sufficed to form the basis for a motion to suppress based on coercion.  Petitioner has not

11  shown this determination to be objectively unreasonable.  Notably, the appellate court could not

12  find a single similar case to Petitioner's which would have supported a successful suppression

13  motion based on coercion through delaying a defendant's opportunity to speak with his

14  grandfather.  It strains credulity to consider a delay in seeing one's dependent grandfather until

15  after transportation to the jail as being such a coercive act that a subsequent statement would be

16  considered involuntary, especially when it was Petitioner himself who offered the conditions.

17       The state court could have also reasoned that Petitioner failed to show that counsel did not

18  in fact research further into Petitioner's coercion theory.  As noted by Respondent, the only

19  evidence Petitioner submitted to the state court in support of his claim was his declaration, in

20  which Petitioner indicated he had no personal knowledge of counsel's investigative actions. (Doc.

21  40-20 at 285.)  Further, he did not support his allegations with any evidence including

22  declarations from the purported witnesses and what their testimony would have been.  This is

23  fatal to Petitioner's claim.  See Hendricks v. Calderon, 70 F.3d 1032, 1042 (9th Cir. 1995) (citing

24  James v. Borg, 24 F.3d 20, 26 (9th Cir.1994)) ("Absent an account of what beneficial evidence

25  investigation into any of these issues would have turned up, [the petitioner] cannot meet the

26  prejudice prong of the Strickland test.").

27       In sum, Petitioner fails to overcome Strickland's high standard of demonstrating the state

28  court rejection of his claim to be objectively unreasonable, nor does he show that the state court

1  decision resulted from an unreasonable determination of the facts.  The claim should be denied.

2  **IV.    RECOMMENDATION**

3  Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas

4  Corpus be DENIED with prejudice on the merits.

5  This Findings and Recommendation is submitted to the United States District Court Judge

6  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

7  Local Rules of Practice for the United States District Court, Eastern District of California.  Within

8  thirty (30) days after being served with a copy of this Findings and Recommendation, any party

9  may file written objections with the Court and serve a copy on all parties.  Such a document

10  should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

11  to the Objections shall be served and filed within fourteen (14) court days (plus three days if

12  served by mail) after service of the Objections.  The Court will then review the Magistrate

13  Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file

14  objections within the specified time may waive the right to appeal the Order of the District Court.

15  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  This recommendation is not an order that is

16  immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to

17  Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District

18  Court's judgment.

19

20  IT IS SO ORDERED.

21  Dated:   **August 12, 2024**                          /s/ *Sheila K. Oberto*

22                                                        UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28

42